MURPHY, Circuit Judge.
I. Introduction
The City of Hugo, Oklahoma, and the Hugo Municipal Authority, a public water trust, (collectively “Hugo”) have contracted with the City of Irving, Texas, (“Irving”) for the sale of water Hugo has been or *1254 seeks to be allocated under permits issued by the Oklahoma Water Resources Board (“Board”). Hugo and Irving brought suit against the nine members of the Board for a declaration that certain Oklahoma laws governing the Board’s water allocation decisions are unconstitutional under the dormant Commerce Clause and an injunction prohibiting their enforcement. The district court granted summary judgment for the Board, and Hugo and Irving appealed. As explained below, Hugo, a political subdivision of Oklahoma, lacks standing to sue the Board under the dormant Commerce Clause. Irving, whose injury is solely premised on a contract it entered into with Hugo, likewise cannot demonstrate standing because any injury to Irving cannot be redressed. Concluding no plaintiff has necessary standing, this court VACATES the district court’s order and REMANDS the case to the district court to dismiss for lack of federal jurisdiction.
II. Background
The Board oversees Oklahoma’s permitting process for appropriating water within the state. Okla. Stat. tit. 82, § 105.9. Hugo, a longstanding holder of two permits issued by the Board, contracted to sell water to Irving for use in Texas. In conjunction with that agreement, Hugo applied for a third permit to appropriate additional water and, later, sought to modify its two existing permits to include Irving as a place of use.[1]
Before the Board acted on its application for a third permit, Hugo filed suit seeking a declaratory judgment that certain Oklahoma laws[2] governing the permitting process are unconstitutional under the dormant Commerce Clause, and an injunction preventing the Board from applying those provisions to Hugo’s applications. In essence, Hugo asserted these laws discriminate against permit applications seeking to appropriate water for out-of-state use, thereby impermissibly burdening interstate commerce. Irving intervened as a plaintiff alleging the same constitutional claims. The district court granted summary judgment for the Board on the dormant Commerce Clause claim, concluding that the Red River Compact, a water compact ratified by Congress, authorized Oklahoma to enact the challenged laws. Accordingly, the district court did *1255 not reach the question whether the statutes would violate the dormant Commerce Clause absent congressional authorization. Hugo and Irving filed the instant appeal.
III. Discussion
Under the doctrine of political subdivision standing, federal courts lack jurisdiction over certain controversies between political subdivisions and their parent states. Branson Sch. Dist. RE-82 v. Romer, 161 F.3d 619, 628 (10th Cir.1998).[3] On appeal, as below, no party raised the issue whether Hugo has standing[4] to sue the Board under the dormant Commerce Clause or whether, if Hugo lacks standing, Irving has standing premised on its contract with Hugo. This court has an independent obligation to assess its own jurisdiction. Thomas v. Metro. Life Ins. Co., 631 F.3d 1153, 1158-59 (10th Cir.2011). The standing requirements rooted in Article III apply equally on appeal as they do in the district court. Id. at 1159. Accordingly, this court ordered the parties to submit supplemental briefs addressing whether either appellant has standing. The analysis begins with Hugo.
A. Hugo’s Standing
1. Analysis
The political subdivision standing doctrine dates back at least as far as the Supreme Court’s decision in City of Trenton v. New Jersey, which concerned the city’s challenge, brought under the Contract and Due Process Clauses, to its parent state’s imposition of a fee for diverting water. 262 U.S. 182, 183-84, 43 S.Ct. 534, 67 L.Ed. 937 (1923). The city had previously purchased water rights from a private company and claimed the state tax effected an uncompensated taking of its property and interfered with its contractual rights to the water. Id. at 184-85, 43 S.Ct. 534. Rejecting the city’s claim, the Court explained that political subdivisions are created by the state merely for convenience of administration. Id. at 185-86, 43 S.Ct. 534. The state, therefore, may delegate the function of public utilities, including the provision of water, to its political subdivisions, but the extent of that delegation “rests in the absolute discretion of the state.” Id. at 186, 43 S.Ct. 534 (quotation omitted). The city lacked standing to sue its parent state in these circumstances, because, as the Court said, “[t]he power of the state, unrestrained by the contract clause or the Fourteenth Amendment, over the rights and property of cities held and used for ‘governmental purposes’ cannot be questioned.” Id. at 188, 43 S.Ct. 534.
The Court later applied the Trenton rule to hold that a political subdivision lacks standing to bring in federal court a Fourteenth Amendment equal protection challenge to its parent state’s actions. Williams v. Mayor & City Council of Balt., 289 U.S. 36, 40, 53 S.Ct. 431, 77 *1256 L.Ed. 1015 (1933). Considering a separate, state-law claim, the Court noted that “[w]e have assumed, without deciding, that the respondents, though without standing to invoke the protection of the Federal Constitution, will be heard to complain of a violation of the Constitution of the state.” Id. at 47, 53 S.Ct. 431 (emphasis added). Relying on Trenton and Williams, this court has barred political subdivisions from advancing Fourteenth Amendment claims against their parent states or other political subdivisions of the same state. See Housing Auth. of Kaw Tribe of Indians v. City of Ponca City, 952 F.2d 1183, 1188-89 (10th Cir.1991); see also City of Moore v. Atchison, Topeka, & Santa Fe Ry., 699 F.2d 507, 511-12 (10th Cir.1983).
Despite the broad language in these early cases, the Supreme Court and courts of appeals have shied away from erecting an absolute bar to political subdivisions asserting rights against their parent states in federal court. In Gomillion v. Light-foot, the Supreme Court explained that these early cases stood for the limited proposition that “the State’s authority is unrestrained [as against political subdivisions] by the particular prohibitions of the Constitution considered in those cases,” rather than granting the states “plenary power to manipulate in every conceivable way ... the affairs of municipal corporations.” 364 U.S. 339, 344, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). Similarly, in Bran-son, this court, while recognizing the longstanding bar to suits under the federal constitutional provisions at issue in Trenton and Williams, nonetheless concluded there was federal jurisdiction over a political subdivision’s claim brought under a federal statute as a Supremacy Clause claim. 161 F.3d at 628-29. Branson made the following distinction: “[A] municipality may not bring a constitutional challenge against its creating state when the constitutional provision that supplies the basis for the complaint was written to protect individual rights,” as opposed to constitutional provisions designed to protect “collective or structural rights” (i.e. the Supremacy Clause). Id. at 628.[5]
Examining the nature of the type of Supremacy Clause claim at issue in Branson reveals a fundamental difference between those claims and claims brought under a substantive provision of the Constitution. The Supreme Court has described the Supremacy Clause as “not a source of any federal rights” but rather operating to “secure federal rights by according them priority whenever they come in conflict with state law.” Chapman v. Hous. Welfare Rights Org., 441 U.S. 600, 613, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979) (quotations omitted). That is, a plaintiff alleging a Supremacy Clause claim is actually alleging a right under some other federal law, which tramps a contrary state law by operation of the Supremacy Clause.
This court’s cases considering political subdivision standing are illustrative. In Branson, the school district alleged the Colorado Enabling Act entitled it to management of school trust lands solely for *1257 the benefit of public education. 161 F.3d at 625-26. The Supremacy Clause was invoked because the district asserted the new state law conflicted with the federal statute. Id. at 630. This court explained that the Colorado Enabling Act was intended to provide rights to the school district itself, as a beneficiary of what the court concluded was a land trust. Id. at 629, 637. Accordingly, the political subdivision had standing to enforce the federal statutory right, guaranteed by operation of the Supremacy Clause in the face of conflicting state law. Id. at 630. Likewise, in Kaw Tribe, this court concluded a housing authority lacked standing to bring a Fourteenth Amendment claim against a local municipality, but could bring a claim alleging certain state conduct conflicted with the requirements of the Fair Housing Act. 952 F.2d at 1192-94. Like in Branson, the court determined that the housing authority fell within the group of aggrieved parties to whom the Act contemplated providing rights. Id. at 1194-95; see also Branson, 161 F.3d at 629-30 (describing Kaw Tribe as allowing a Supremacy Clause claim). In each case, the source of substantive rights was a federal statute directed at protecting political subdivisions, and the Supremacy Clause was invoked merely to guarantee, as a structural matter, that federal law predominates over conflicting state law. This understanding of the Supremacy Clause informs the use of the words “structural” and “collective” to describe the rights political subdivisions may vindicate in federal court against their parent states. See Branson, 161 F.3d at 628.
The dormant Commerce Clause, unlike the Supremacy Clause, itself provides substantive rights. See Dennis v. Higgins, 498 U.S. 439, 447, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991) (“It is clear, however, that the Commerce Clause does more than confer power on the Federal Government; it is also a substantive restriction on permissible state regulation of interstate commerce.” (quotation omitted)). The Commerce Clause reads, “The Congress shall have [pjower ... [t]o regulate Commerce ... among the several States.” U.S. Const, art. I, § 8, cl. 3. In City of Philadelphia v. New Jersey, the Supreme Court explained the judicially created doctrine of the dormant Commerce Clause:
Although the Constitution gives Congress the power to regulate commerce among the States, many subjects of potential federal regulation under that power inevitably escape congressional attention because of their local character and their number and diversity. In the absence of federal legislation, these subjects are open to control by the States so long as they act within the restraints imposed by the Commerce Clause itself. The bounds of these restraints appear nowhere in the words of the Commerce Clause, but have emerged gradually in the decisions of this Court giving effect to its basic purpose.
437 U.S. 617, 623, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978) (citations and quotation omitted). Accordingly, just as the rights at issue in Trenton and Williams, secured by Constitutional provisions beginning with “No state shall ...,” U.S. Const, art. I, § 10, cl. 1; U.S. Const, amend. XIV, § 1, the dormant Commerce Clause limits the states’ ability to act in certain ways.
The parties have not identified, and this court has not found, a single case in which the Supreme Court or a court of appeals has allowed a political subdivision to sue its parent state under a substantive provision of the Constitution. Instead, courts have allowed such suits only when Congress has enacted statutory law specifically providing rights to municipalities. See supra n. 5. This court’s decisions in Branson and Kaw Tribe are entirely consistent with this great weight of precedent. Because the claims at issue here are based on a substantive provision of the Constitution, *1258 and because the Supreme Court has made clear that the Constitution does not contemplate the rights of political subdivisions as against their parent states, Hugo lacks standing under Branson. Accordingly, this court concludes Hugo has no standing to invoke the dormant Commerce Clause against the Board under the doctrine of political subdivision standing.[6]
2. The Dissent
The dissent asserts the “modern trend [is] to limit the scope of the political subdivision standing doctrine,” and this court’s decision in Branson must be read within that context. Dissenting Op. at 1266. So read, the dissent contends Branson fully supports the conclusion that Hugo has standing to sue its parent state. Id. at 1265, 1271-75. For those reasons set out below, the dissent’s reading of Branson is simply not tenable.
The dissent begins with the broad supposition that the modern judicial trend is to limit the scope of the Supreme Court’s decisions in Trenton and Williams. Id. at 1266. In particular, the dissent relies on the decisions in Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), and Board of Education of Central School District No. 1 v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), to support the notion that “courts should read the earlier political subdivision standing cases more narrowly.” Dissenting Op. at 1269. It is certainly true that most federal courts have backed away from early twentieth century absolutist statements indicating political subdivisions can never sue their parent states. That trend is why many courts, with the notable exception of the Ninth Circuit, allow suits based on federal statutes that contemplate the rights of political subdivisions. See Bran-son, 161 F.3d at 628-30; Dissenting Op. at 1268 n. 4. Nevertheless, we have not found, and the dissent has not cited, a single case where a court of appeals or the Supreme Court has expressly allowed to proceed a claim by a municipality against its parent state premised on a substantive provision of the Constitution.[7] Instead, as set out *1259 above, this court and others have allowed suits by political subdivisions seeking to vindicate against a parent state rights granted by Congress under a federal statute. See supra at 1255-56 & 1256 n. 5; see also, e.g., Branson, 161 F.3d at 629 (claim under Colorado Enabling Act as enforced by the Supremacy Clause); Kaw Tribe, 952 F.2d at 1193 (claim under Fair Housing Act enforced by the Supremacy Clause); Rogers v. Brochette, 588 F.2d 1057, 1067-71 (5th Cir.1979) (claim under “statutes establishing the federal school breakfast program” enforced by the Supremacy Clause).
Furthermore, the cases cited by the dissent do not support the broad assertion that the Supreme Court has strayed from its historic understanding of the Constitution as not contemplating political subdivisions as protected entities vis-a-vis their parent states. The dissent relies heavily on dicta from Gomillion to support its assertion that “state legislative control of municipalities is subject to constitutional limitations.” Dissenting Op. at 1268. The problem with the dissent’s reliance on Gomillion is that the case does not involve a suit by a municipality against its parent state. Instead, Gomillion involves a suit by individual citizens of Tuskegee, Alabama to enjoin, as violative of the Fourteenth and Fifteenth Amendments, a state redistricting law that changed the shape of the city. 364 U.S. at 340, 81 S.Ct. 125. The language relied upon by the dissent merely reiterates that Trenton and Williams were about particular constitutional guarantees rather than ruling that a subdivision may never sue its state. Id. at 343, 81 S.Ct. 125 (“[I]n dealing with claims under broad provisions of the Constitution, which derive content by an interpretive process of inclusion and exclusion, it is imperative that generalizations, based on and qualified by the concrete situations that gave rise to them, must not be applied out of context in disregard of variant controlling facts.”). Properly read, Gomillion stands for the commonsense, limited proposition that a state’s actions vis-a-vis municipalities may impact the rights of individuals living in the communities and that those impacted individuals are not denied the protections of the Constitution merely because the municipality itself is not contemplated by the constitutional provisions at issue. Id. at 345, 347-48, 81 S.Ct. 125. Contrary to the dissent’s assertions, Gomillion is not remotely inconsistent with the view that federal statutes may provide rights to political subdivisions which they can enforce in court, while constitutional guarantees simply do not contemplate political subdivisions’ own rights vis-a-vis their parent states. See Ysursa v. Pocatello Educ. Ass’n, 555 U.S. 353, 129 S.Ct. 1093, 1101, 172 L.Ed.2d 770 (2009) (“A private corporation enjoys constitutional protections, but a political subdivision, created by the state for the better ordering of government, has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator.” (citation and quotation omitted)).
Nor does the Court’s decision in Allen support the dissent’s novel assertion that the dormant Commerce Clause confers rights on Hugo. In Allen, an Establishment Clause case, the sole discussion of the municipal entity’s standing was contained in a footnote, which said, in its entirety:
Appellees do not challenge the standing of appellants to press their claim in this Court. Appellants have taken an oath to support the United States Constitution. Believing [the relevant state law] to be unconstitutional, they are in the position of having to choose between violating their oath and taking a step— refusal to comply with [state law] — that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts. There can be no doubt that appellants thus *1260 have a ‘personal stake in the outcome’ of this litigation. Baker v. Carr, 369 U.S. 186, 204 [82 S.Ct. 691, 7 L.Ed.2d 663] (1962).
392 U.S. at 241 n. 5, 88 S.Ct. 1923. This passage makes clear that the situation in Allen is very different from the situation here. In Allen, standing was based on the individual board members’ personal stake in losing their jobs. Id.
Having set out its vision of a modern jurisprudential trend toward the broad availability of suits by political subdivisions to vindicate constitutional interests, the dissent then proceeds to read Branson as fully supportive of this purported trend. See Dissenting Op. at 1269-72. The dissent’s expansive reading of Branson, which completely unhinges the case from its factual moorings, is ultimately unconvincing.
The dissent begins its analysis of Bran-son by focusing largely on the following language from that decision: “Despite the sweeping breadth of [the opinions], both Williams and Trenton stand only for the limited proposition that a municipality may not bring a constitutional challenge against its creating state when the constitutional provision that supplies the basis for the complaint was written to protect individual rights, as opposed to collective or structural rights.” Branson, 161 F.3d at 629; see also Dissenting Op. at 1270-71. According to the dissent, this language from Branson cannot stand for the utterly modest and limited proposition that a municipality can sue its parent state only when Congress has conferred upon the municipality a right or privilege and the municipality’s parent state denies it the benefit of that right or privilege in derogation of federal law. Instead, the dissent asserts, Branson must stand for a much more grandiose proposition: the Constitution confers on political subdivisions some “collective rights” and political subdivisions can sue their parent states to enforce those collective constitutional rights. Dissenting Op. at 1270 (“Branson did not carve out from Trenton and its progeny an exception to political subdivision standing doctrine just to allow judicial review of preemption claims. Instead, Branson read Trenton as establishing a ‘limited proposition’ that blocks judicial review only when ‘the constitutional provision that supplies the basis for the complaint was written to protect individual rights, as opposed to collective or structural rights.’ ” (quoting Branson, 161 F.3d at 628)).
Branson simply will not bear the weight the dissent seeks to place upon it. Branson did not involve in any way the question whether political subdivisions can sue their parent states to enforce substantive provisions of the Constitution. Instead, the case involved the far more limited question whether a political subdivision could enforce against its parent state, through the Supremacy Clause, rights accorded it by the Colorado Enabling Act, a federal statute. Branson, 161 F.3d at 625. In answering that question in the affirmative, Branson relied primarily on this court’s previous decision in Kaw Tribe and the Fifth Circuit’s decision in Rogers. Id. at 630 (adopting as the “better rule” the “one supported by Rogers and Kaw Tribe ”). As is the case with Branson, neither Kaw Tribe nor Rogers involved a municipality trying to enforce a substantive provision of the Constitution. Instead, each involved the question whether a political subdivision could enforce against its parent state, via the Supremacy Clause, rights accorded it by a federal statute or statutory scheme. Kaw Tribe, 952 F.2d at 1193 (claim under Fair Housing Act enforced through the Supremacy Clause); Rogers, 588 F.2d at 1067-71 (claim under “statutes establishing the federal school breakfast program” enforced via the Supremacy Clause).[8] Given that Branson *1261 did not involve an attempt by a political subdivision to enforce against its parent state a substantive provision of the Constitution, and further given that none of the primary authorities cited in Branson involved such a situation, it is odd indeed for the dissent to read Branson as resolving this exceedingly important issue. Instead, as set out above, Branson should be read, consistent with its factual underpinnings, as simply holding that Trenton and Williams do not bar suits by municipalities against their parent states to enforce, via the Supremacy Clause, the provisions of federal statutes conferring rights on those very municipalities. See supra at 1257 (“In [both Branson and Kaw Tribe ], the source of substantive rights was a federal statute directed at protecting political subdivisions, and the Supremacy Clause was invoked merely to guarantee, as a structural matter, that federal law predominates over conflicting state law. This understanding of the Supremacy Clause informs the use of the words ‘structural’ and ‘collective’ to describe the rights political subdivisions may vindicate in federal court against their parent states.”).[9]
Having broadly interpreted Branson as validating suits by political subdivisions against their parent states to enforce substantive constitutional provisions granting collective rights, the dissent proceeds to *1262 conclude the dormant Commerce Clause confers such collective rights on Hugo. Dissenting Op. at 1271-75. For those reasons set out above, Branson simply cannot be read to embrace the notion that use of the terms “collective” and “structural” meant to refer to anything other than the situation where a political subdivision has brought suit against its parent to vindicate substantive federal statutory rights through the Supremacy Clause. Even if this court were willing, as is the dissent, to disconnect the holding in Branson from its facts, we would still be compelled to reject the dissent’s contention that the dormant Commerce Clause protects collective rights, as opposed to individual economic rights.
Not only does the dormant Commerce Clause, unlike the Supremacy Clause, provide substantive restraints on state action, it also concerns rights that are properly characterized as guaranteed to individuals. As the Court has said, the doctrine “invalidate^] local laws that impose commercial barriers or discriminate against an article of commerce by reason of its origin or destination out of State.” C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 390, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). That is, a seller or buyer has a right not to be impeded in commercial transactions because of an impermissibly discriminatory state law. Dennis, 498 U.S. at 447, 111 S.Ct. 865 (“Th[e] combined restriction on state power and entitlement to relief under the Commerce Clause amounts to a right, privilege, or immunity under the ordinary meaning of those terms.” (quotation omitted)). Hugo and Irving cite this court’s decision in Quik Payday, Inc. v. Stork, for the proposition that the dormant Commerce Clause protects the market, not individual firms. 549 F.3d 1302, 1309 (10th Cir.2008). Read in context, however, the language in Quik Payday clearly refers to the question how to measure the burden on interstate commerce, not who holds enforceable rights under the doctrine. See id. In any event, structural rights described in Branson concern the relationship between the federal government and the states, not the relationship between the states and the private market, which the dormant Commerce Clause protects. Certainly, nothing in Quik Payday suggests the dormant Commerce Clause specifically contemplates the rights of political subdivisions, as did the federal laws at issue in Branson and Kaw Tribe.
The existence of what is referred to as the “market participant” exception to the dormant Commerce Clause doctrine reinforces the view that the rights protected are individual in nature.[10] In Reeves, Inc. v. Stake, the Supreme Court distinguished between states acting in the capacity of a market participant versus a market regulator. 447 U.S. 429, 436-37, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980). It concluded “the Commerce Clause responds principally to state taxes and regulatory measures impeding free private trade in the national marketplace,” and thus the dormant Commerce Clause had no bearing on the actions of states when acting as a trader or manufacturer itself. Id. As this doctrine makes clear, the rights protected by the dormant Commerce Clause are private, free trade, free market rights, inherently contemplating the protection of individuals engaged in commerce. The dormant Commerce Clause, like the Fourteenth Amendment and the Contract Clause, contemplates individual rather than structural rights under Bran-son.[11]
*1263 Finally, it is worth noting that the path taken by the dissent to reach its conclusion seems less than clear. The dissent asserts that pursuant to Branson,
the relevant comparison is not between a Supremacy Clause claim and a dormant Commerce Clause claim. It is between a preemption claim based on a federal statute and a dormant Commerce Clause claim....
The Supremacy Clause plays the same role in either case because it requires that the federal law, whether a federal statute or the dormant Commerce Clause, will prevail if it conflicts with state law.
Dissenting Op. at 1271. The thrust of the dissent’s argument is less than clear. “[A]ll federal actions to enjoin a state enactment rest ultimately on the Supremacy Clause.” Swift & Co. v. Wickham, 382 U.S. 111, 126, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965). This is not only true of federal statutes and the dormant Commerce Clause, but also of the protections set out in the Contract Clause and the Fourteenth Amendment. Nevertheless, the Supreme Court has conclusively determined that municipalities cannot sue their parent states for violations of the Contract Clause or the Fourteenth Amendment’s Due Process and Equal Protection Clauses. See supra at 1255-56. Thus, that the dormant Commerce Clause is enforced through the Supremacy Clause says nothing at all as to whether a municipality can sue its parent state to enforce its provisions. It is for this very reason that the dissent’s envisioned dichotomy between “preemption claims” and “individual rights claims” is a false dichotomy. See Cooper v. Aaron, 358 U.S. 1, 17-18, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958) (holding the Supreme Court’s interpretation of the Fourteenth Amendment is the supreme law of the land and is binding on the states through the Supremacy Clause).
The Supreme Court made clear in Trenton and Williams that the Constitution does not confer upon the political subdivisions rights as against their parent states. Ysursa, 129 S.Ct. at 1101. The rule set out in Trenton and Williams is not implicated, however, when Congress enacts positive federal law affording rights to political subdivisions. Rogers, 588 F.2d at 1070. Relying heavily on Rogers, this is the exact rule adopted by this court. Branson, 161 F.3d at 628-30. Because the claims advanced by Hugo are not based on a federal statutory enactment affording it federal rights, but are instead based on a constitutional provision affording individual economic rights, Hugo lacks standing to bring the claims in federal court. Id.
B. Irving’s Standing
Irving, unlike Hugo, is suing not its parent state, but another state. The political subdivision standing doctrine has no applicability in such a circumstance. Nonetheless, Irving must still meet the traditional standing requirements. Under Article III, a plaintiff must demonstrate standing to sue by showing an injury-in-fact, that the injury is fairly traceable to the defendant’s conduct, and that the injury is likely to be redressed by the relief sought. Bennett v. Spear, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); Stewart v. Kempthorne, 554 F.3d 1245, 1253 (10th Cir.2009) (naming as constitutional standing requirements injury-in-fact, causation, and redressability).
Here, Irving, a plaintiff-intervenor in the district court, based its claims of injury solely on the contract between it and Hugo for the sale of water. Its complaint explained the broad terms of the agreement, *1264 including Hugo’s pending applications to modify its existing permits and obtain a new permit to fulfill its obligations under the agreement. It further alleged the challenged state laws prevented the performance of the contract, i.e., Irving’s purchase of water. Irving never alleged it had any pending applications for water permits which would be affected by the challenged laws or that it had identified any other potential or actual sellers of water, including private sellers, aside from Hugo.
Even assuming Irving could demonstrate an injury-in-fact and causation, Irving’s standing arguments fail on the third constitutional prong, redressability. To demonstrate redressability, a party must show that a favorable court judgment is likely to relieve the party’s injury. Coll v. First Am. Title Ins. Co., 642 F.3d 876, 892 (10th Cir.2011). This court previously considered the standing of a commercial timber company to challenge an agency preservation plan which prevented the sale of timber rights in a particular area. Wyo. Sawmills, Inc. v. U.S. Forest Serv., 383 F.3d 1241, 1246-47 (10th Cir.2004). The timber company’s standing ultimately failed because “the federal agency has complete discretion as to whether to offer the opportunity sought by the plaintiff, and accordingly, the courts do not have the power to grant the only relief that would rectify the alleged injury.” Id. at 1249.
The circumstances here are analogous. If a federal court were to declare, as Irving urges, the challenged Oklahoma laws unconstitutional under the dormant Commerce Clause, the dormant Commerce Clause still would not constrain the Board’s actions with respect to Hugo’s permit applications. As explained above, Hugo’s “power to hold and manage” water rights “rests in the absolute discretion of the state.” City of Trenton, 262 U.S. at 186, 43 S.Ct. 534 (quotation omitted).[12] Invalidating the challenged laws under the dormant Commerce Clause would not compel the Board to grant Hugo’s applications, or even to process them in any particular way. As Hugo and Irving’s joint reply brief on appeal asserts, the lawsuit challenges the Board’s “ability to discriminatorily deny Hugo’s application to appropriate Oklahoma water.” Because Hugo does not have rights under the dormant Commerce Clause against its parent state, Irving’s injury would not be redressed by the remedy it seeks.
The cases cited by Hugo and Irving for the proposition that political subdivisions of one state may sue another state under the dormant Commerce Clause over allegedly discriminatory water permitting laws are inapposite because they do not involve a political subdivision of one state whose claim is premised on a contract with a political subdivision of the defendant state. Rather, those cases concern political subdivisions attempting to access the private market or obtain a permit directly from the defendant state. See, e.g., City of El Paso v. Reynolds, 563 F.Supp. 379, 381 (D.N.M.1983) (city in Texas sought water permit directly from permitting authority of New Mexico and also contracted for the purchase of water from a private New Mexico company); City of Altus v. Carr, 255 F.Supp. 828, 831 (W.D.Tex.1966) (city in Oklahoma contracted for purchase of water from private landowners in Texas). Because of that posture, were a court to declare the challenged state laws in those cases unconstitutional, plaintiffs’ injuries would be redressed because the defen *1265 dants would be prohibited from applying the unconstitutional law to the applications of private entities and out-of-state municipalities. The case here is very different. Because Irving’s standing is premised solely on its contract with Hugo, and because Hugo itself possesses no rights under the dormant Commerce Clause as against its parent state, Irving is unable to meet the third constitutional standing requirement of redressability.
IV. Conclusion
For the foregoing reasons, the district court’s order is VACATED and the case is REMANDED to the district court to dismiss for lack of federal jurisdiction.

. At a minimum, the parties agree the applications to modify existing permits are still pending, although whether the application for an additional appropriation is still pending or has been "deemed withdrawn” is in dispute.

. Initially, the suit challenged Okla. Stat. tit. 82, § IB, a five-year moratorium on export of water out of state; Okla. Stat. tit. 74, § 122l.A, a five year moratorium on the creation of any water compact or agreement exporting water out of state; Okla. Stat. tit. 82, § 1085.2(2), which prohibits conveying water out of state without legislative authorization; Okla. Stat. tit. 82, § 105.16(B), which exempts from a requirement that permitted water be put to beneficial use within seven years only those water permits that, inter alia, "promote the optimal beneficial use of water in the state”; and Okla. Stat. tit. 82, § 1085.22, which prohibits permitting for the sale or resale of water for use outside Oklahoma. Thereafter, the legislature enacted reforms to the permitting process, and, separately, the five-year moratorium expired. The complaint was amended to add challenges to four of the newly enacted provisions: Okla. Stat. tit. 82, § 105.12(A)(5), which requires the Board in deciding permit applications for out-of-state water use to consider whether water can be feasibly transported to alleviate shortages within Oklahoma; Okla. Stat. tit. 82, § 105.12A(B)(1), which provides no permit for out-of-state water use can issue if it will impair the ability of Oklahoma to meet its obligations under any water compact; Okla. Stat. tit. 82, § 105.12(F), which requires review of any permit for out-of-state water use every ten years; and Okla. Stat. tit. 82, § 105.12A(D), which forbids issuing a permit for out-of-state water use without legislative approval if that water is subject to a water compact.

. This principle applies equally to suits against state officials in their official capacity, such as the members of the Board in this case. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

. For those reasons set out at length by the Fifth Circuit in Rogers v. Brochette, 588 F.2d 1057, 1068-70 (5th Cir.1979), there is serious reason to doubt whether "standing” in the Article III context is at issue in the Trenton and Williams line of cases. Branson School District RE-82 v. Romer, however, casts the matter as one of jurisdictional standing, 161 F.3d 619, 628 (10th Cir.1998), and is binding on this panel absent an intervening contrary decision of the Supreme Court or of this court sitting en banc. United States v. Mitchell, 518 F.3d 740, 752 n. 14 (10th Cir.2008). In any event, whether the Trenton line is properly viewed as a question of standing or a substantive determination that the Constitution does not afford rights to political subdivisions as against their stales, the proper outcome of this case is the same.

. A majority of other courts to consider the question of whether a political subdivision may bring a Supremacy Clause claim against its parent state have agreed. See S. Macomb Disposal Auth. v. Twp. of Washington, 790 F.2d 500, 504-05 (6th Cir.1986) (suggesting Supremacy Clause claim allowed); United States v. Alabama, 791 F.2d 1450, 1454 (11th Cir.1986) (same); Rogers, 588 F.2d at 1070-71 (allowing Supremacy Clause claim); City of Bristol v. Earley, 145 F.Supp.2d 741, 744 (W.D.Va.2001) (same); Bd. of Educ. of Twp. High School Dist. No. 205 v. Ill. State Bd. of Educ., No. 85-L-8349, 1989 WL 106610, at *6 (N.D.Ill. Sept. 11, 1989) (same); but see Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank, 136 F.3d 1360, 1363-64 (9th Cir.1998) (no political subdivision suit against parent state allowed).

. It is noteworthy that there is an almost complete lack of cases reaching the merits of a dormant Commerce Clause claim brought by a political subdivision against its parent state. See City of New Bedford v. Woods Hole, No. 00-12049, 2003 WL 21282212, at *3 (D.Mass. May 23, 2003) (granting plaintiff's motion for voluntary dismissal of dormant Commerce Clause claim); Atl. Coast Demolition & Recycling Inc. v. Bd. of Chosen Freeholders, 893 F.Supp. 301, 314-15 (D.N.J.1995) (dismissing dormant Commerce Clause claim for lack of political subdivision standing); School Dist. v. Pa. Milk Mktg. Bd., 877 F.Supp. 245, 251 (E.D.Pa.1995) (same); cf. City of Burbank, 136 F.3d at 1362 (describing dormant Commerce Clause claim among those brought and, without separate discussion of each claim, dismissing the entire lawsuit for lack of political subdivision standing under the Ninth Circuit's per se rule). The one notable exception is City of New Rochelle v. Town of Mamaroneck, 111 F.Supp.2d 353 (S.D.N.Y.2000). In New Rochelle, the court raised sua sponte the question of political subdivision standing as to a municipality's claims against another state political subdivision under the Fourteenth Amendment. Id. at 363-65. There is no discussion of any kind as to the application of the political subdivision standing doctrine to claims arising under the dormant Commerce Clause. Id. at 362-63.

. The dissent asserts it is unsurprising there is a dearth of dormant Commerce Clause cases by municipalities against their parent states because the type of state regulation implicating the dormant Commerce Clause would typically favor local governments. Dissenting Op. at 1271 n. 10. The problem for the dissent, however, is not limited to the complete absence of appellate cases involving dormant Commerce Clause claims of the type at issue here. There is a complete absence of appellate cases involving any type of claim by a political subdivision against its parent state based on a substantive provision of the Constitution.

. Notably, the Fifth Circuit's decision in Rogers fully supports the majority's reading of *1261 Branson. Rogers interpreted the Trenton line as holding that "the Constitution does not interfere in the internal political organization of states.” 588 F.2d at 1057. So interpreted, the Fifth Circuit concluded the Trenton line was not implicated when a political subdivision is attempting to enforce, through the Supremacy Clause, a federal statute affording it substantive rights. According to Rogers
[The school district's] claim is that Congress, exercising its power under Article I [of the Constitution], has interfered with Texas’s internal political organization, at least to the extent of allowing a school district to ignore the state’s mandate to decide for itself whether to accept the breakfast program. There is every reason to think that Congress may interfere with a state's internal political organization in ways that the Constitution itself does not interfere; the Supreme Court has never said otherwise.
Id. (emphasis added).

. According to the dissent, "the majority ... incorrectly denies that Branson set the stage to decide the question presented here: whether the dormant Commerce Clause was written to protect an individual right or a structural right. Branson anticipated this question and foreshadowed the answer.” Dissenting Op. at 1266. The problem with the dissent’s assertion, of course, is that Branson offers no such foreshadowing. As set out at length above, Branson did not involve in any way the question whether substantive provisions of the Constitution afford rights to political subdivisions vis-a-vis their parent states. See supra at 1260. Instead, it merely held, consistent with our prior decision in Kaw Tribe and the Fifth Circuit’s decision in Rogers, that when Congress provides statutory rights to municipalities, municipalities can enforce those rights through the Supremacy Clause against their parent states. Branson, 161 F.3d at 629 ("Our conclusion that the school district plaintiffs have the power to bring their federal claims against the state under the Supremacy Clause and the Colorado Enabling Act is buttressed by recent case law from the circuits.”). For that very same reason, the dissent is also off track in claiming
If Branson meant to restrict political subdivision standing to certain preemption claims, its distinction between individual and structural rights would be superfluous. Under the majority’s reading, only preemption claims count as a structural right. But Branson did not distinguish between claims based on a constitutional provision and a federal statute. It distinguished between claims based on individual and structural rights.
Dissenting Op. at 1271. What would truly be odd is for Branson to announce a rule that political subdivisions can sue their parent states to enforce some undefined class of substantive constitutional provisions when the issue was not before the court, none of the cases cited by Branson involved such a question, and no other appellate court had ever so held.

. Because ultimately this court concludes Hugo and Irving lack standing to sue the Board under the dormant Commerce Clause, there is no occasion to pass on whether the market participant exception would apply to Oklahoma’s actions at issue in this case.

. As a result, whether Hugo is "substantially independent” from the state as to allow it to *1263 maintain suit against the state need not be examined. See Branson, 161 F.3d at 629.

. The state is free, of course, as a matter of state law, to give rights to its political subdivisions and give the power to enforce those rights in state court. Whether Hugo possesses rights under any law other than the dormant Commerce Clause is not presented in this case.