HOLMES, Circuit Judge, dissenting.
 

 I respectfully dissent. Unlike the majority, I would affirm the district court's judgment based on the political-subdivision standing doctrine. For the political-subdivision plaintiffs ("Plaintiffs") to have standing, our decision in
 
 City of Hugo v. Nichols
 
 ,
 
 656 F.3d 1251
 
 (10th Cir. 2011), requires that they seek to enforce a federal statute directed at protecting or specifically providing rights to political subdivisions (sometimes referred to collectively herein as the "directed at protecting" requirement). The district court ruled against them on this dispositive issue, and their argument challenging that ruling is so meager as to constitute waiver. Moreover, their argument-insofar as I am able to piece it together-also fails on the merits. The majority truncates its analysis before reaching these issues, ruling that doing so would require "impermissibly delving into the merits of the case." Maj. Op. at 1204. However, our prior cases counsel that a court must consider those issues in answering the threshold question of standing and that it may do so without impermissibly implicating the merits. Accordingly, I respectfully dissent.
 

 As we observed in
 
 Branson School District RE-82 v. Romer
 
 ,
 
 161 F.3d 619
 
 (10th Cir. 1998), it is "well-settled" in this circuit that a political subdivision "may not bring a federal suit against its parent state" on the basis of certain constitutional provisions.
 

 Id.
 

 at 628
 
 . However,
 
 Branson
 
 also described limitations on this bar: notably, it suggested that the bar applies only "when the constitutional provision that supplies the basis for the complaint was written to protect individual rights, as opposed to collective or structural rights."
 

 Id.
 

 In particular, the
 
 Branson
 
 court was unable to locate any Supreme Court decision barring a subdivision from asserting "the structural protections of the Supremacy Clause ... against its creating state."
 

 Id.
 

 at 629
 
 .
 

 The political-subdivision plaintiffs in
 
 Branson
 
 (Colorado school districts) brought just such a viable challenge, primarily to state constitutional changes modifying the terms under which a state land board would manage its holdings.
 

 Id.
 

 at 627
 
 . Specifically, the land board was no longer required to manage its holdings to secure the "maximum possible amount" for
 a public school fund; rather, the board was simply required to manage its holdings to "produce reasonable and consistent income over time."
 

 Id.
 

 The plaintiffs challenged these changes "under the Supremacy Clause and the Colorado Enabling Act," and the
 
 Branson
 
 court concluded that the challenge could proceed.
 

 Id.
 

 at 629 ;
 
 see also
 

 id.
 

 at 630
 
 ("[O]ur holding simply allows a political subdivision to sue its parent state when the suit alleges a violation by the state of some controlling federal law. The Supremacy Clause guarantees no less."). In reaching this conclusion,
 
 Branson
 
 noted that the plaintiffs were both "substantially independent" of the state of Colorado and, "[m]ost importantly," they were " 'essentially' the beneficiaries of the federal trust at issue."
 

 Id.
 

 at 629
 
 . That is, the Enabling Act had granted millions of acres of "school lands" to the State of Colorado for "the support of the 'common schools,' " and "[t]oday's public school districts are the direct political descendants of those 19th Century 'common schools.' "
 

 Id.
 

 Nearly thirteen years later, our court decided
 
 City of Hugo
 
 . There, we observed that the Supremacy Clause is not itself the source of any federal rights; instead, it secures federally protected rights when they conflict with state law.
 
 656 F.3d at 1256
 
 . As such, "a plaintiff alleging a Supremacy Clause claim is actually alleging a right under some
 
 other
 
 federal law, which trumps a contrary state law by operation of the Supremacy Clause."
 

 Id.
 

 After summarizing our case law regarding political-subdivision standing (including
 
 Branson
 
 ),
 
 City of Hugo
 
 was unable to find "a single case in which the Supreme Court or a court of appeals has allowed a political subdivision to sue its parent state under a substantive provision of the Constitution."
 

 Id.
 

 at 1257
 
 . "Instead, courts have allowed such suits only when Congress has enacted statutory law
 
 specifically providing rights to
 
 municipalities."
 

 Id.
 

 (emphasis added);
 
 see also
 
 id.
 

 (harmonizing prior cases finding standing and observing that, in those cases, "the source of substantive rights was a federal statute
 
 directed at protecting political subdivisions
 
 , and the Supremacy Clause was invoked merely to guarantee, as a structural matter, that federal law predominates over conflicting state law" (emphasis added)). Because the claims in
 
 City of Hugo
 
 were based on a substantive provision of the Constitution, i.e., the dormant Commerce Clause, and because "the Constitution does not contemplate the rights of political subdivisions as against their parent states," standing was lacking.
 

 Id.
 

 at 1257-58
 
 .
 

 Here, political subdivisions of the State of Colorado challenge Colorado's Taxpayer Bill of Rights ("TABOR") under the Colorado Enabling Act and the Supremacy Clause, contending that TABOR contradicts the Enabling Act's requirement that Colorado maintain a "republican form of government."
 
 [1]
 

 See
 
 Aplts.' App., Vol. XII, at 1424, 1426, 1448 (Fourth Am. Compl., filed Dec. 6, 2016). The district court analyzed the case under
 
 Branson
 
 and
 
 City of Hugo
 
 , ruling that the Plaintiffs did not establish that they were seeking to enforce "any rights granted to them under the Enabling Act."
 
 Id.
 
 at 1575-84 (Op. & Order, dated May 4, 2017);
 
 see
 

 id.
 
 at 1578 ("
 
 City of Hugo
 
 explains that the federal statute being enforced must be 'directed at protecting political subdivisions.' " (quoting
 
 City of Hugo
 
 ,
 
 656 F.3d at
 
 1257 )). The
 district court reviewed several paragraphs of the Fourth Amended Complaint that the Plaintiffs had cited, concluding that most of these paragraphs simply made "no mention of rights being granted in the Enabling Act to the [Plaintiffs]."
 
 Id.
 
 at 1579.
 

 In the district court's view, the Fourth Amended Complaint's only "potentially relevant paragraphs" were Paragraphs 30 and 34.
 
 Id.
 
 at 1580. Paragraph 30 contended that the Enabling Act required "use of, and revenue from, the federal lands ceded to the State upon admission as a state to be dedicated to 'the support of common schools' (Section 7), 'support of a State university' (Section 10), and 'the two sections of land in each township herein granted for the support of common schools ... the proceeds to constitute a permanent school-fund, the interest of which to be expended in the support of common schools' (Section 14)."
 
 Id.
 
 at 1430 (omission in original). And, according to Paragraph 34, TABOR prevents "the State and its local school districts from fulfilling their obligations, derived from the original state constitution, and its derivation from the Enabling Act, adequately to fund the public schools of the State."
 
 Id.
 
 at 1431.
 

 The district court concluded that these allegations were insufficient to establish standing. Preliminarily, the district court ruled that none of these provisions provided any succor to Plaintiffs
 
 not
 
 associated with public schools, i.e., boards of county commissioners or special districts.
 
 See
 

 id.
 
 at 1580. It also observed that the briefing on this issue was limited, and that the Plaintiffs "ma[d]e no effort" to explain how the cited paragraphs of the Fourth Amended Complaint, and the authorities therein, gave rise to standing.
 
 Id.
 
 Moreover, the district court rejected the Plaintiffs' reliance on Section 10 of the Colorado Enabling Act because none of them are state universities, and it rejected the Plaintiffs' allegations concerning Sections 7 and 14 of the Enabling Act as inapposite.
 
 See
 

 id.
 
 at 1581-82. That is, while Sections 7 and 14 concern "support of common schools," they do not implicate the right to a "republican form of government" sought to be enforced here; in other words, unlike the suit brought in
 
 Branson
 
 , this suit does not directly concern the land-trust and funding issues addressed by these provisions of the Enabling Act.
 
 See id.
 
 The district court also observed that, although the Enabling Act
 
 does
 
 expressly contemplate a state constitution that is "republican in form," the Enabling Act counsels that such a constitution is for "the people of [Colorado],"
 
 see
 

 18 Stat. 474
 
 §§ 4 -5 (1875), with no specific mention of political subdivisions. Aplts.' App., Vol. XII, at 1583.
 

 On appeal, the Plaintiffs contend that their suit passes muster under
 
 Branson
 
 , and indeed is more like that case than like
 
 City of Hugo
 
 , because they seek to vindicate
 
 structural
 
 rights, not
 
 individual
 
 ones. Aplts.' Opening Br. at 23. In a footnote, they argue that the district court impermissibly "stretched" dicta in
 
 Branson
 
 (not
 
 City of Hugo
 
 ) to require that they sue to enforce a statute "directed at protecting political subdivisions."
 

 Id.
 

 at 26 n.13. They also contend that
 
 City of Hugo
 
 is distinguishable because the claim in
 
 City of Hugo
 
 was "an 'individual' claim under the terminology of
 
 Branson
 
 " and that their claim is distinct from that in
 
 City of Hugo
 
 because their claim relies on a federal statute (the Enabling Act), rather than a substantive constitutional provision.
 
 Id.
 
 at 23, 28-30.
 

 I would reject any argument that
 
 City of Hugo
 
 is inapplicable. While it is true that
 
 City of Hugo
 
 directly addressed enforcement of the dormant Commerce Clause,
 
 City of Hugo
 
 expressly distinguished that claim from one where "the source of substantive rights was a federal statute
 
 directed
 

 at protecting
 
 " or "
 
 specifically providing rights to
 
 " political subdivisions, and, critically, it observed that our cases (and, indeed, all the Supreme Court and court of appeals cases it could find) have allowed political-subdivision standing only in the presence of the latter showing.
 
 See
 

 656 F.3d at 1257
 
 (emphases added).
 
 City of Hugo
 
 also opined that "
 
 Branson
 
 simply cannot be read to embrace the notion that use of the terms 'collective' and 'structural' meant to refer to anything other than the situation where a political subdivision has brought suit against its parent to vindicate substantive federal statutory rights through the Supremacy Clause."
 

 Id.
 

 at 1262
 
 . Thus, our most recent comprehensive exploration of this issue,
 
 City of Hugo
 
 , requires a political-subdivision plaintiff's "structural" claim to be undergirded by a statute providing it with rights to enforce.
 

 Because
 
 City of Hugo
 
 applies, the Plaintiffs must seek to enforce a federal statute "directed at protecting political subdivisions" or "specifically providing rights to" them.
 

 Id.
 

 at 1257
 
 . Having trained its attention on distinguishing
 
 City of Hugo
 
 , however, the Opening Brief makes virtually no argument that this "directed at protecting" requirement is satisfied. Instead, the Opening Brief generally reiterates the nature of the Plaintiffs' claims, i.e., they "allege that TABOR violates the provision of the Enabling Act requiring a republican form of government, and that such violation is actionable against the state under the Supremacy Clause," Aplts.' Opening Br. at 24, and they "seek to enforce a claim under the Enabling Act: the right to a republican form of government,"
 
 id.
 
 at 28. In connection with these cursory arguments, the Plaintiffs cite essentially the same paragraphs of the Fourth Amended Complaint that the district court found unavailing; yet, significantly, they offer no explanation as to why the district court's analysis of the legal import of these paragraphs was wrong.
 
 See
 

 id.
 
 at 24, 28. In light of this limited argument, I would deem the issue waived.
 
 See, e.g.
 
 ,
 
 United States v. Cooper
 
 ,
 
 654 F.3d 1104
 
 , 1128 (10th Cir. 2011) (citing "well-settled" principle that "[a]rguments inadequately briefed in the opening brief are waived" (quoting
 
 Adler v. Wal-Mart Stores, Inc.
 
 ,
 
 144 F.3d 664
 
 , 679 (10th Cir. 1998) ));
 
 see also
 

 Reedy v. Werholtz
 
 ,
 
 660 F.3d 1270
 
 , 1275 (10th Cir. 2011) ("The argument section of Plaintiffs' opening brief does not challenge the court's reasoning on this point. We therefore do not address the matter.").
 

 In any event, the limited argument that I can discern is unavailing. It seems that, in the Plaintiffs' view,
 
 Branson
 
 establishes that political-subdivision standing is broadly available for claims under the Enabling Act, and they are simply following the trail blazed in that case: "Here, as in the
 
 Branson
 
 litigation, the [Plaintiffs] claim the protections afforded under a federal statute, the Enabling Act, which imposes the
 
 structural
 
 requirement that Colorado's government be 'republican in form.' " Aplts.' Opening Br. at 24;
 
 see also
 

 id.
 
 at 27 ("That same Enabling Act conditioned Colorado's admission into the Union upon its enactment of a constitution that was 'republican in form.' "). But the Plaintiffs elide a key distinction relied upon by the district court and consistent with both
 
 Branson
 
 and
 
 City of Hugo
 
 : the issues in
 
 Branson
 
 directly implicated
 
 specific
 
 provisions of the Enabling Act providing lands "for the support of the 'common schools,' " of which the school-district plaintiffs were "direct political descendants."
 
 161 F.3d at 629
 
 . Indeed,
 
 Branson
 
 deemed it "[m]ost important[ ]" that the school districts were "essentially" the beneficiaries of the land trust that had been affected by state constitutional changes.
 

 Id.
 

 Here, in contrast and as the district court correctly observed, there is no similarly close link between the "republican form of government" that the Plaintiffs claim TABOR
 

 contravenes and the land-management and funding issues addressed in the provisions of the Enabling Act that the Plaintiffs cited in their Fourth Amendment Complaint and continue to rely on.
 
 See
 
 Aplts.' App., Vol. XII, at 1581-82. I also agree with the district court that, to the extent that the Enabling Act expressly requires a republican form of government, it does not suggest that the requirement is directed at protecting or specifically providing rights to Colorado's political subdivisions.
 
 Id.
 
 at 1582-83.
 

 Our political-subdivision standing cases require a plaintiff to show that its claims are undergirded by a federal statute directed at protecting or providing rights to it. The Plaintiffs have not satisfied this standard; indeed, they present very limited argument on this issue and make only feeble challenges to the district court's ruling. Because the political-subdivision standing bar is an independent jurisdictional bar, I would affirm the district court's ruling solely on this basis.
 
 Cf.
 

 Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.
 
 ,
 
 549 U.S. 422
 
 , 425,
 
 127 S.Ct. 1184
 
 ,
 
 167 L.Ed.2d 15
 
 (2007) (holding that federal court could dismiss case on
 
 forum non conveniens
 
 grounds without conclusively deciding issues of subject-matter jurisdiction).
 

 The majority makes a different determination, opining that the district court "could not properly reach its conclusions at this stage of litigation." Maj. Op. at 1192. Before I discuss my reasons for diverging from the majority's views, I note several issues which are left unresolved by the majority's opinion. First, although the majority evinces some uncertainty as to whether political-subdivision standing is properly considered a type of "prudential standing"-notably, intimating that
 
 Lexmark International, Inc. v. Static Control Components, Inc.
 
 ,
 
 572 U.S. 118
 
 ,
 
 134 S.Ct. 1377
 
 ,
 
 188 L.Ed.2d 392
 
 (2014), may have put in doubt on whether this form of standing is a jurisdictional bar,
 
 see
 
 Maj. Op. at 1194-95 n.4, 1195-96 n.6-the majority ultimately follows our prior cases that treat political-subdivision standing as a jurisdictional matter, and it thus analyzes political-subdivision standing entirely separately from prudential standing.
 
 See
 

 City of Hugo
 
 ,
 
 656 F.3d at
 
 1255 n.4 (observing that
 
 Branson
 
 "casts the matter [of political-subdivision standing] as one of jurisdictional standing"). Second, although the majority voices concerns about the contours and workability of applying the "directed at protecting" component of
 
 City of Hugo
 
 , it expressly declines to "resolve" these concerns (albeit while citing them as "supplementary support" for its result). Maj. Op. at 1195 n.6. Third, it declines to determine the "precise reach" of
 
 Branson
 
 and
 
 City of Hugo
 
 or choose definitively between the differing readings offered by the Plaintiffs and the district court because, in its view, "under either proffered formulation the district court erred."
 
 Id.
 
 at 1195.
 

 Instead, the crux of the majority's analysis is that "[e]stablishing
 
 who
 
 was intended to benefit from the Enabling Act's 'republican in form' requirement necessarily begs the question of
 
 what
 
 a 'Republican Form of Government' is, which is the issue ultimately to be resolved if any court ever succeeds in reaching the merits of this case."
 
 Id.
 
 at 1196. In other words, in the majority's view, grappling with the "directed at protecting" component of
 
 City of Hugo
 
 would require "impermissibly delving into the merits of the case."
 
 Id.
 
 at 1196.
 

 I part ways with the majority here. Our cases
 
 do
 
 generally emphasize the importance of distinguishing between the standing inquiry and merits issues, with the latter including the elements of a claim and whether that claim has been successfully
 stated.
 
 See
 

 id.
 
 at 1198-99;
 
 see also, e.g.
 
 ,
 
 Day v. Bond
 
 ,
 
 500 F.3d 1127
 
 , 1137 (10th Cir. 2007) (" 'For purposes of standing,' ... 'the question cannot be whether the Constitution, properly interpreted, extends protection to the plaintiff's asserted right or interest,' because that would be a determination of the merits of the plaintiffs' claim under the guise of an evaluation of their standing." (quoting
 
 Initiative & Referendum Inst. v. Walker
 
 ,
 
 450 F.3d 1082
 
 , 1092 (10th Cir. 2006) (en banc))). However, the cases the majority relies on do not involve the political-subdivision standing doctrine or the embedded "directed at protecting" requirement. In that context, as I have set forth
 
 supra
 
 ,
 
 City of Hugo
 
 is our primary guidepost. That case reiterates that political-subdivision standing is jurisdictional,
 
 see
 

 656 F.3d at
 
 1255 n.4, and requires a political-subdivision plaintiff to show-as part of a
 
 threshold jurisdictional standing
 
 inquiry-that it seeks enforcement of a federal statute directed at protecting or specifically providing rights to political subdivisions like it,
 

 id.
 

 at 1257
 
 . Thus, in analyzing standing in this specific context,
 
 City of Hugo
 
 requires a federal court to analyze the nature of the claim or rights at issue, at least as far as is necessary to determine who may seek to enforce them. Irrespective of whether this may sometimes resemble a merits analysis, it is precisely what
 
 City of Hugo
 
 contemplates.
 

 I note further that falling back on
 
 Branson
 
 is of no avail to the majority's position: although a "directed at protecting" requirement is not clearly stated in that case,
 
 Branson
 
 still considered and ultimately found "[m]ost important[ ]" to its analysis the fact that the plaintiffs were " 'essentially' the beneficiaries of the federal trust at issue."
 
 161 F.3d at 629
 
 . Thus, our precedent certainly permits, and in my view requires, a court to determine a federal statute's beneficiaries as part of its standing analysis and contemplates that a court may make such a determination without impermissibly implicating the merits. I respectfully submit that the majority, in concluding otherwise, fails to correctly apply this precedent. Nor does the majority attempt to persuasively distinguish this precedent, much less demonstrate that it has been superseded by subsequent Supreme Court authority.
 
 [2]
 

 Much of the majority's disquiet seems to be based on a perceived lack of "workable standards" and its view that "disentangling" the meaning of "republican form of government" will be an "immense task" not amenable to resolution in the context of a Rule 12(b)(1) motion. Maj. Op. at 1195-96 n.6, 1199-1200;
 
 see also
 

 id.
 
 at 1196-97 (stating that these issues cannot be resolved on "the present record" and that the Plaintiffs' briefing "hint[s] at" complex merits arguments concerning the meaning of this phrase);
 
 id.
 
 at 1196-97 (suggesting that the district court and the State "valiantly struggle to
 
 conclusively
 
 establish" that the Plaintiffs are not beneficiaries of a "republican form of government");
 
 id.
 
 at 1197 (citing "the degree of uncertainty present at this stage"). I disagree: as I observed
 
 supra
 
 , the Plaintiffs have made virtually no argument at this stage that,
 
 if
 
 a "directed at protecting"
 

 requirement applies, it is satisfied.
 
 See also
 

 id.
 
 at 1199 (appearing to acknowledge that arguments concerning the "meaning, scope, and intended beneficiaries" of the "republican in form" requirement "were not presented to the district court and are not before us"). Our political-subdivision standing cases and general standing principles both counsel that it is the Plaintiffs' burden to satisfy this standard.
 
 See, e.g.
 
 ,
 
 Utah Ass'n of Ctys. v. Bush
 
 ,
 
 455 F.3d 1094
 
 , 1100 (10th Cir. 2006) (observing that party seeking to invoke jurisdiction must establish standing).
 

 Additionally, complexity alone does not permit a court to forestall the full evaluation of jurisdictional issues. Earlier in this litigation, a panel evaluated the "justiciability hurdle" of the political-question doctrine under a six-factor test, evaluating at length, for example, whether the federal constitutional guarantee of a "republican form of government" is textually committed to another branch, whether judicially discoverable and manageable standards exist for interpreting that guarantee, and whether evaluating the issue requires making policy determinations.
 
 Kerr v. Hickenlooper
 
 ,
 
 744 F.3d 1156
 
 , 1172, 1176-81 (10th Cir. 2014),
 
 cert. granted
 
 ,
 
 judgment vacated on other grounds
 
 , --- U.S. ----,
 
 135 S. Ct. 2927
 
 ,
 
 192 L.Ed.2d 956
 
 (2015) ;
 
 see also
 

 Morgan v. McCotter
 
 ,
 
 365 F.3d 882
 
 , 887 (10th Cir. 2004) (observing that "the question of justiciability implicates this court's jurisdiction"). And it did so with special attention to not "reaching or considering the merits."
 
 See
 

 Kerr
 
 ,
 
 744 F.3d at 1179
 
 . I see no reason why-if required-a similarly searching analysis might not be undertaken in this context, and similarly fine distinctions might not ultimately be drawn between standing and merits issues, in evaluating
 
 whom
 
 the Enabling Act's requirement of a republican form of government was directed at protecting or specifically providing rights to.
 

 To be sure, there may be conceivable arguments for reevaluating or cabining our political-subdivision standing doctrine. But the majority does not meaningfully grapple with those arguments here, let alone expressly adopt them. Instead, the majority purports to
 
 accept
 
 the jurisdictional, decisional rubric laid out in our political-subdivision standing cases but then effectively departs entirely from the requirements of that rubric in resolving this case. I cannot travel this path.
 

 Therefore, for the foregoing reasons, I respectfully dissent.
 

 Although the Fourth Amended Complaint alleges that TABOR also runs afoul of other laws, e.g., the federal Constitution's analogous Guarantee Clause and Colorado's state constitution, Aplts.' App., Vol. XII, at 1447-49, the Plaintiffs' political-subdivision standing arguments are premised on the Enabling Act and Supremacy Clause, Aplts.' Opening Br. at 24-25.
 

 I find irrelevant the analysis in
 
 Largess v. Supreme Judicial Court for State of Massachusetts
 
 ,
 
 373 F.3d 219
 
 (1st Cir. 2004) (per curiam), which the majority repeatedly cites.
 
 See
 
 Maj. Op. at 1196-98, 1196-97 n.7.
 
 Largess
 
 's ostensibly relevant standing analysis, where that panel ruled standing was "intertwined [with] and inseparable from the merits of the underlying claim," concerned whether the plaintiffs shared "an undifferentiated harm with other voters,"
 
 373 F.3d at 224
 
 , not the political-subdivision standing doctrine. Of course, this out-of-circuit decision also did not purport to apply (and in fact predated) our court's decision in
 
 City of Hugo
 
 , which is binding precedent.