# United States Court of Appeals
## For the First Circuit

No. 04-1621

ROBERT P. LARGESS, ELIZABETH A. POIRIER, JOHN A. LEPPER,
EDWARD G. CONNOLLY, CHRISTOPHER P. ASSELIN, STEVEN C.
PANAGIOTAKOS, PHILIP TRAVIS, JAMES R. MICELI, PETER J. LARKIN,
ROBERT S. HARGRAVES, EMILE J. GOGUEN, MARK J. CARRON,

Plaintiffs, Appellants,

v.

SUPREME JUDICIAL COURT FOR THE STATE OF MASSACHUSETTS; CHIEF
JUSTICE MARGARET MARSHALL, in the official capacity as Justice of
the Supreme Judicial Court of Massachusetts, JUSTICE ROBERT J.
CORDY, in the official capacity as Justice of the Supreme
Judicial Court of Massachusetts, JUSTICE JUDITH A. COWIN, in the
official capacity as Justice of the Supreme Judicial Court of
Massachusetts, JUSTICE JOHN M. GREANEY, in the official capacity
as Justice of the Supreme Judicial Court of Massachusetts,
JUSTICE RODERICK L. IRELAND, in the official capacity as Justice
of the Supreme Judicial Court of Massachusetts, JUSTICE MARTHA B.
SOSMAN, in the official capacity as Justice of the Supreme
Judicial Court of Massachusetts, JUSTICE FRANCIS X. SPINA, in the
official capacity as Justice of the Supreme Judicial Court of
Massachusetts, MASSACHUSETTS DEPARTMENT OF PUBLIC HEALTH;
CHRISTINE C. FERGUSON, in her official capacity as Commissioner
of the Massachusetts Department of Public Health; JUDITH A.
MCCARTHY, in her official capacity as City Registrar for the city
of Boston; CITY AND TOWN CLERKS 1-350; LINDA DAVIES; GLORIA
BAILEY; GINA SMITH; HEIDI NORTON; RICHARD LINNELL; GARY
CHALMNERS; ELLEN WADE; MAUREEN BRODOFF; EDWARD BALMELLI; MICHAEL
HORGAN; ROBERT CROMPTON; DAVID WILSON; JULIE GOODRIDGE; HILLARY
GOODRIDGE,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

---

Before

Boudin, <u>Chief Judge</u>,
Lynch, <u>Circuit Judge</u>,
and Howard, <u>Circuit Judge</u>.

---

        <u>Matthew D. Staver</u>, with whom <u>Erik W. Stanley</u>, <u>Anita L. Staver</u>, <u>Joel L. Oster</u>, <u>Rena M. Lindevaldsen</u>, <u>Liberty Counsel</u>, <u>Robert J. Muise</u>, <u>Thomas More Law Center</u>, <u>Stephen M. Crampton</u>, <u>Brian Fahling</u>, <u>AFA Center for Law and Policy</u>, <u>Chester Darling</u>, and <u>Citizens for the Preservation of Constitutional Rights</u>, were on brief, for appellants.
        <u>Merita A. Hopkins</u>, Corporation Counsel, City of Boston, with whom <u>Gregory B. Franks</u>, Assistant Corporation Counsel, was on brief, for appellee Judith A. McCarthy.
        <u>Peter Sacks</u>, Assistant Attorney General, with whom <u>Thomas F. Reilly</u>, Attorney General of Massachusetts, was on brief, for appellee Supreme Judicial Court of Massachusetts.
        <u>Mary L. Bonauto</u>, with whom <u>Bennett H. Klein</u>, <u>Michele M. Granda</u>, <u>Karen L. Loewy</u>, <u>Gay & Lesbian Advocates & Defenders</u>, <u>Kenneth J. Parsigian</u>, <u>Abigail K. Hemani</u>, <u>Goodwin Procter LLP</u>, were on brief, for appellees Hillary Goodridge and Julie Goodridge, et al.

---

June 29, 2004

---

**Per Curiam**.  Plaintiffs brought suit in United States District Court against the Supreme Judicial Court of Massachusetts (the "SJC") and others, alleging that the remedy adopted in the same-sex marriage decision, Goodridge v. Department of Public Health, 798 N.E.2d 941 (Mass. 2003), violated their rights under the Guarantee Clause of the federal Constitution.  The SJC, in a divided opinion, held in Goodridge that "barring an individual from the protection, benefits, and obligations of civil marriage solely because that person would marry a person of the same sex violates the Massachusetts Constitution."  798 N.E.2d at 969.  As a remedy, the court ordered that the state of Massachusetts recognize the marriage of same-sex couples within six months of the opinion's issuance.  Id. at 968-70.  The SJC later held that it was an insufficient remedy under the Massachusetts Constitution merely to afford same-sex partners the same benefits as married couples without also recognizing their marriage.  See Opinions of the Justices to the Senate, 802 N.E.2d 565, 569-72 (Mass. 2004).

The plaintiffs, a Massachusetts citizen named Robert Largess and eleven members of the Massachusetts legislature acting as individuals, sought to enjoin the May 17, 2004 implementation of Goodridge and the issuance or recording of marriage licenses to same-sex couples.  Julie Goodridge and her new spouse Hillary Goodridge, the named plaintiffs in the Goodridge case, along with

several others, intervened in the federal action on the side of the defendants.

The plaintiffs' federal suit asserted that the remedy[1] that the SJC adopted in <u>Goodridge</u> redefined marriage in violation of separation-of-powers principles in the Massachusetts Constitution. Under the state constitution, according to the plaintiffs, it is the prerogative of the state legislature, not the courts, to define the term "marriage." The plaintiffs also asserted that the Massachusetts Constitution itself defines the term "marriage" according to its historical meaning as a union between a man and a woman, and thus that <u>Goodridge</u> effected an impermissible amendment of the state constitution that further violated separation-of-powers principles. From the initial premise that the <u>state</u> constitution was violated, the plaintiffs next asserted that the remedy in <u>Goodridge</u> violated their rights under the <u>federal</u> Guarantee Clause of the U.S. Constitution by depriving them of a republican form of government.

In support of their first argument that the SJC usurped the legislature's authority, the plaintiffs relied heavily on one clause of the Massachusetts Constitution:

---

[1] Plaintiffs assert that they are not challenging any holding by the SJC that same-sex couples are entitled to marital benefits. Rather, they say, the challenge is to the SJC's "usurping" the legislature's prerogative to define the term "marriage" and to its redefinition of that term in a way that is inconsistent with the understanding held by the framers of the Massachusetts Constitution.

> All causes of marriage, divorce, and alimony, and all appeals from the judges of probate shall be heard and determined by the governor and council, until the legislature shall, by law, make other provision.

Mass. Const. pt. 2, ch. III, art. V. The SJC had earlier rejected that very argument as "based on the erroneous premise that [Goodridge] constituted a 'cause[] of marriage, divorce, [or] alimony' within the meaning of the Massachusetts Constitution." Goodridge v. Dep't of Public Health, No. SJC-08860 (Mass. May 7, 2004) (order denying motion to intervene).

The plaintiffs, arguing state law illegality, also relied on the SJC's holding in Opinion of the Justices, 85 N.E.2d 761 (1949), that the legislature would impermissibly amend the Massachusetts Constitution were it to pass a bill providing that "subways, tunnels, viaducts, elevated structures and rapid transit extensions . . . are hereby declared to be public highways or bridges within the meaning of" the Massachusetts Constitution. 85 N.E.2d at 762. Such a bill, held the SJC, would contravene the principle that the state constitution's "words are to be given their natural and obvious sense according to common and approved usage at the time of their adoption." Id. at 763. Similarly, the plaintiffs argued that by altering the historic meaning of the term "marriage," which is contained in the Massachusetts Constitution, the SJC in Goodridge itself amended the state constitution, a process that normally must be initiated by voters of Massachusetts

-5-

and acted upon by the legislature, <u>see</u> Mass. Const. amend. art. XLVIII.

The federal district court denied the plaintiffs' requests for preliminary and permanent injunctive relief, a declaratory judgment, and a temporary restraining order.[2]  <u>Largess</u> v. Goodridge, No. 04-10921-JLT, 2004 U.S. Dist. LEXIS 8461, at *18 (D. Mass. May 13, 2004).  The court concluded that the SJC did, under the Massachusetts Constitution, have the power to redefine marriage and that, in doing so, the SJC did not perform a legislative act.  <u>See</u> <u>id.</u> at *13-*18.  The plaintiffs appealed the denial of preliminary and permanent injunctive relief and the denial of a declaratory judgment, and requested an injunction pending appeal.

By order dated May 14, 2004, this court denied the requested injunction pending appeal on the ground that the plaintiffs' "showing so far made as to likelihood of success [on

---

[2] To obtain preliminary injunctive relief, plaintiffs had the burden of showing (1) a likelihood of success on the merits; (2) that they would suffer irreparable injury if injunctive relief were not issued; (3) that such injury outweighs any harm that would stem from granting injunctive relief; and (4) that the public interest weighs in their favor.  <u>See</u> <u>R.I. Dep't of Envtl. Mgmt.</u> v. <u>United States</u>, 304 F.3d 31, 45 (1st Cir. 2002).  The standard is virtually identical for permanent injunctive relief, except that "the movant must show actual success on the merits of the claim, rather than a mere likelihood of such success."  <u>K-Mart Corp.</u> v. <u>Oriental Plaza, Inc.</u>, 875 F.2d 907, 914-15 (1st Cir. 1989).  The decision whether to grant relief is based on a balancing of the different factors, with likelihood of success playing a pivotal role.  <u>See</u> <u>Ross-Simons of Warwick, Inc.</u> v. <u>Baccarat, Inc.</u>, 102 F.3d 12, 16 (1st Cir. 1996).

the claimed deprivation of a republican form of government] is not sufficient to justify interim relief."  In doing so, we noted various potential barriers to plaintiffs' claims, including the doctrine that the decisions of a state's highest court on issues of state law, including state constitutional law, are generally treated as authoritative by federal courts.  See Johnson v. Fankell, 520 U.S. 911, 916 (1997); Schad v. Arizona, 501 U.S. 624, 636 (1991); Murdock v. City of Memphis, 87 U.S. (20 Wall.) 590 (1875).  We expedited the appeal, and oral argument was held on June 7, 2004.

On May 17, 2004, after the plaintiffs had filed their appeal but before oral arguments were heard, Massachusetts implemented Goodridge's requirement that same-sex marriage be recognized.  Since then, Massachusetts has issued marriage licenses to same-sex couples and has recorded same-sex marriages.  Thus, the plaintiffs' desired injunction would now have the effect of stopping this practice after, rather than before, it had begun.[3]

## I.

The state defendants and the defendant-intervenors raise

---

[3] For this reason, there is no merit to the argument of defendant-intervenors (which was not joined by the state defendants) that this appeal is moot because May 17 has come and passed.  Injunctive relief could now issue to stop future marriages, so a live controversy is still present and the case is not moot.

a series of preliminary objections, some of which involve interesting and difficult issues.[4]

First, the defendants argue that the plaintiffs lack standing because, at most, they share an undifferentiated harm with other voters. Allen v. Wright, 468 U.S. 737, 754 (1984); Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 220-21 (1974). But the circumstances of this case present a rare instance in which the standing issue is intertwined and inseparable from the merits of the underlying claim. If the plaintiffs are correct that the Guarantee Clause extends rights to individuals in at least some circumstances,[5] then the usual standing inquiry -- which distinguishes between concrete injuries and injuries that are merely abstract and undifferentiated -- might well be adjusted to the nature of the claimed injury. Cf. Flast v. Cohen, 392 U.S. 83, 105-06 (1968) (in certain circumstances, federal taxpayers have

---

[4] One preliminary objection of the defendants is based on asserted Eleventh Amendment immunity. We have no need to address this issue. See Parella v. Ret. Bd. of R.I. Employees' Ret. Sys., 173 F.3d 46, 56-57 (1st Cir. 1999) (need not reach Eleventh Amendment issue if other grounds for decision in favor of party asserting immunity are available).

[5] It is of note for purposes of the standing inquiry that the Guarantee Clause makes the guarantee of a republican form of government to the states; the bare language of the Clause does not directly confer any rights on individuals vis-á-vis the states. Whether, in the sorts of extreme cases discussed below, voters or other individuals could enforce the Clause is an issue we need not decide.

standing to raise Establishment Clause claims against congressional acts).

A second preliminary objection made by the defendants is that Guarantee Clause claims are <u>always</u> non-justiciable under the political question doctrine[6] and related caselaw. <u>See</u> <u>Luther</u> v. <u>Borden</u>, 48 U.S. (7 How.) 1, 42 (1849) (finding non-justiciable a Guarantee Clause argument by an individual claiming to act under the authority of a state charter government because Congress, not the federal courts, should decide which of two competing Rhode Island governments should be recognized). At oral argument, the state defendants retreated from this absolutist position and acknowledged that there may be extreme cases in which a Guarantee Clause claim would be justiciable, such as those involving "permanent martial law, [the] declaration of a monarchy, [or] perhaps a hostile takeover of one branch by another." Another potential example, defendants acknowledged, might be a case presenting the same facts as this case but in which the state constitution had no mechanism for amendment, so that it was simply beyond the power of the people to alter the SJC's holding. These concessions by the state defendants demonstrate that resolving the

---

[6] The political question doctrine has been infrequently used in recent times. As this court noted in <u>Doe</u> v. <u>Bush</u>, 323 F.3d 133 (1st Cir. 2003), in the last forty years (now forty-one) the Supreme Court has found a case non-justiciable on the basis of the political question doctrine only twice, and it has explicitly rejected the doctrine in a number of cases. <u>Id.</u> at 140-41.

issue of justiciability in the Guarantee Clause context may also turn on the resolution of the merits of the underlying claim.

Another preliminary objection advanced by the defendants is that this court should defer to the SJC's resolution of the Massachusetts constitutional law questions raised by the plaintiffs. Because the claimed federal Guarantee Clause violation here depends on supposed <u>state</u> constitutional violations that the SJC has specifically rejected, the defendants argue that the plaintiffs cannot establish a necessary premise to their federal case. The defendants are correct that federal courts should generally defer to a state's highest court on issues of state law. <u>See</u> <u>Johnson</u>, 520 U.S. at 916; <u>Schad</u>, 501 U.S. at 636; <u>Murdock</u>, 87 U.S. at 590. But it is at least arguable that the Guarantee Clause might provide an exception to that rule of deference in extreme cases, such as where the members of a state's highest court declared the state to be a monarchy and themselves its regents. This issue ultimately need not be resolved here, because, as we explain below, the plaintiffs have not established a <u>federal</u> Guarantee Clause violation on the facts here, regardless of whether the remedy in <u>Goodridge</u> offends the Massachusetts Constitution.[7]

---

[7] For this reason, we do not consider the district court's determination of the state, not federal, law issue of whether the SJC's exercise of jurisdiction and holding in <u>Goodridge</u> were consistent with the Massachusetts Constitution. As the brief for the state defendants filed by the Attorney General of Massachusetts notes, a federal court "should be wary of . . . attempt[s] to draw the Court into reviewing the decision of a state's highest court on

-10-

**II.**

The crucial question raised by plaintiffs' case is why the state constitutional violations they allege, assuming they exist, amount to a violation of the federal Constitution's Guarantee Clause. Plaintiffs' argument is that the alleged transgressions of the Massachusetts Constitution have deprived them of a republican form of government by intruding on the people's rights to elect representatives and structure the government. According to the plaintiffs, not every separation-of-powers violation under a state constitution leads to this result, but this one does. Plaintiffs argue that this is because here three conditions have been met: (1) the delegation or limitation of power to one branch in the state constitution is express, (2) there is a "clear departure" from the historic status quo, and (3) this "clear departure" seriously impairs a representative form of government.

Defendants argue that the Supreme Court has found Guarantee Clause claims non-justiciable where they were "'political' in nature and where there [was] a clear absence of judicially manageable standards." Reynolds v. Sims, 377 U.S. 533, 582 (1964) (citing Baker v. Carr, 369 U.S. 186, 217-32 (1962)). In response, plaintiffs say that their own criteria provide the needed

matters of state constitutional law." The district court's approach unnecessarily opened the door, as the state defendants note, to a new way "for those dissatisfied by state court decisions to seek federal court review," by simply labeling their dissatisfaction as a Guarantee Clause claim.

-11-

judicially manageable standards, but they do not purport to find those standards in Supreme Court precedent.

Whether or not the plaintiffs can satisfy their self-tailored test, they simply have no viable Guarantee Clause claim on these facts. First, the text of the Guarantee Clause does not support such a claim. Second, the Supreme Court's caselaw interpreting the Guarantee Clause rejects the plaintiffs' expansive reading of the provision. Third, recognizing the plaintiffs' claim would ultimately undermine the very purposes of the Guarantee Clause, as the Supreme Court has noted.

We begin with the text of the Guarantee Clause. It provides that:

> The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.

U.S. Const. art. IV, § 4. We do not purport to spell out the entire scope or meaning of the Clause's guarantee of a republican form of government. In fact, scholars have interpreted this portion of the Guarantee Clause in numerous, often conflicting, ways. See William M. Wiecek, The Guarantee Clause of the U.S. Constitution 293-303 (1972) (outlining different interpretations of the Guarantee Clause); see also Akhil Reed Amar, The Central Meaning of Republican Government: Popular Sovereignty, Majority Rule, and the Denominator Problem, 65 U. Colo. L. Rev. 749, 749

(1994); Erwin Chemerinsky, Cases Under the Guarantee Clause Should be Justiciable, 65 U. Colo. L. Rev. 849, 864-69 (1994); Henry Paul Monaghan, We the Peoples, Original Understanding, and the Constitutional Amendment, 96 Colum. L. Rev. 121, 164-65 (1996); G. Edward White, Guaranteeing a Republican Form of Government: Reading the Guarantee Clause, 65 U. Colo. L. Rev. 787, 803 (1994). And John Adams himself, twenty years after ratification of the Constitution, confessed that he "never understood" what the Guarantee Clause meant and that he "believ[ed] no man ever did or ever will." Letter from John Adams to Mercy Warren (July 20, 1807), quoted in Wiecek, supra, at 13.

Despite the conflicting views on the precise meaning of the Guarantee Clause, the text itself provides guidance. The first portion of the Clause is only implicated when there is a threat to a "Republican Form of Government." "Republican" is commonly defined as "of, relating to, or having the characteristics of a republic: having the form or based on the principles of a republic." Webster's Third New International Dictionary 1928 (1993). "Republic," in turn, is defined as "a government in which supreme power resides in a body of citizens entitled to vote and is exercised by elected officers and representatives responsible to them and governing according to law." Id.; see also Oxford English Dictionary (2d ed. 1989) (defining "republic" as "[a] state in which the supreme power rests in the people and their elected

representatives or officers, as opposed to one governed by a king or similar ruler"). The Guarantee clause does not require a particular allocation of power within each state so long as a republican form of government is preserved. Indeed, the forms of each state government at the time of the adoption of the Constitution varied in terms of separations of powers, see Robert J. Pushaw, Jr., Justiciability and Separation of Powers: A Neo-Federalist Approach, 81 Cornell L. Rev. 393, 408-11 (1996), and are each presumed to have been "Republican" within the meaning of the Guarantee Clause, see Minor v. Happersett, 88 U.S. (21 Wall.) 162, 175-76 (1874). If there is any role for federal courts under the Clause, it is restricted to real threats to a republican form of government. The allocation of powers, including the amendment powers, set forth in the Massachusetts Constitution, at the time of adoption and now, self-evidently do not violate the Clause.

Comparing the text of the Guarantee Clause to the different text of Article II, § 1, cl. 2 of the U.S. Constitution provides further support for limiting federal court intervention in state separation-of-powers violations, except, perhaps, in the most egregious circumstances. The text of Article II, § 1, cl. 2 provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct" electors for President and Vice President. In contrast to the Guarantee Clause, this clause explicitly implicates state separation-of-powers issues by

conferring a right or obligation upon one branch of the state government. The extent to which this more explicit text authorizes federal courts to intervene in state separation-of-powers violations is nonetheless far from clear. While several members of the Supreme Court have suggested that federal courts can indeed review the internal allocations of power in a state government under the text of this clause, see Bush v. Gore, 531 U.S. 98, 112 (Rehnquist, C.J., concurring) (joined by Justices Scalia and Thomas), that argument has been rejected by other members of the Court, see id. at 123-24 (Stevens, J., dissenting) (joined by Justices Ginsburg and Breyer) ("[N]othing in Article II of the Federal Constitution frees the state legislature from the constraints in the State Constitution that created it."). Accordingly, it is not clear whether the text of Article II, § 1, cl. 2 provides a basis for federal courts to review potential state separation-of-powers violations. In the absence of extreme cases, it is hard to understand the much less explicit text of the Guarantee Clause, which does not clearly reference state separation-of-powers issues, generally to authorize such review.

The Supreme Court cases addressing the Guarantee Clause confirm what the plain text of the Clause suggests: most disputes concerning the relationship among a state government's constituent branches do not offend the Constitution's guarantee of a republican form of government. The Supreme Court first said as much in

-15-

<u>Forsyth</u> v. <u>City of Hammond</u>, 166 U.S. 506 (1897). Responding to a claim that powers belonging to a state legislature were given to the state courts in violation of the Guarantee Clause, the Supreme Court noted that "[t]he preservation of legislative control in such matters is not one of the essential elements of a republican form of government" that is guaranteed to the states. <u>Id.</u> at 519. The Court later generalized this point, observing in response to a Guarantee Clause claim that "[h]ow power shall be distributed by a state among its governmental organs is commonly, if not always, a question for the state itself." <u>Highland Farms Dairy, Inc.</u> v. <u>Agnew</u>, 300 U.S. 608, 612 (1937); <u>see also</u> <u>Pac. States Tel. & Tel. Co.</u> v. <u>Oregon</u>, 223 U.S. 118, 150-57 (1912) (Guarantee Clause defense asserted by corporation against state's action to enforce payment of taxes is non-justiciable).

Plaintiffs argue that the Supreme Court has not closed the door to Guarantee Clause claims. They point out that the Court assumed arguendo that the Clause was applicable in <u>New York</u> v. <u>United States</u>, 505 U.S. 144, 185 (1992), and that it used some expansive language to describe the Clause in <u>Printz</u> v. <u>United States</u>, 521 U.S. 898, 919 (1997).[8] But as the plaintiffs

---

[8] In <u>Printz</u>, the Court noted that the Guarantee Clause "presupposes the continued existence of the states and . . . those means and instrumentalities which are the creation of their sovereign and reserved rights," and thus that, through the Guarantee Clause and several other clauses, the states "retained a residuary and inviolable sovereignty" when the federal government was established. 521 U.S. at 919 (internal quotations omitted).

acknowledge, neither New York nor Printz affirmatively held that the Guarantee Clause could appropriately be invoked on the facts in those cases. Both cases, moreover, are easily distinguishable from the present case because they involved claims by a state that the executive and legislative branches of the federal government were interfering with state matters. In this suit, by contrast, individuals are attempting to invoke the Guarantee Clause against state officials, and federalism concerns about the scope of congressional authority are simply absent.[9]

Most importantly, though, New York and Printz do not establish that separation-of-powers violations within a state, such as those alleged by the plaintiffs, constitute Guarantee Clause violations. Much to the contrary, the Court in New York affirmed that the Guarantee Clause (if claims under it are justiciable at all) is only offended in highly limited circumstances. It held that there was no possible violation of the Clause in that case

---

[9] Acknowledging the different context in which New York and Printz were decided, plaintiffs draw on academic commentary to argue that the Guarantee Clause confers judicially cognizable rights on individuals as well as states. See Chemerinsky, supra, 65 U. Colo. L. Rev. at 851 (the Guarantee Clause is a "protector of basic individual rights and should not be treated as being solely about the structure of government"); Debra F. Salz, Discrimination-Prone Initiatives and the Guarantee Clause: A Role for the Supreme Court, 62 Geo. Wash. L. Rev. 100 (1993). They also rely on a Kansas Supreme Court decision, VanSickle v. Shanahan, 511 P.2d 223 (Kan. 1973), which found justiciable (though ultimately non-meritorious) a Guarantee Clause challenge to a state constitutional amendment abolishing the offices of state treasurer and auditor. See 511 P.2d at 227, 240, 243.

because the states retained "the ability to set their legislative agendas" and "state government officials remain[ed] accountable to the local electorate." 505 U.S. at 185. The same is true here.

The obvious question here is why the possibility of amending the Massachusetts Constitution, see Mass. Const. amend. art. XLVIII, against the background of normal election of the legislature and governor by voters, is not sufficient to eliminate any plausible claim of a deprivation of a republican form of government under the Guarantee Clause. Although the possibility of amending the constitution is not the only safeguard, it is certainly the most direct.

Plaintiffs respond that the change in the definition of marriage is so momentous that it overshadows either of these checks available to the citizens of Massachusetts for two reasons. First, any amendment to the Massachusetts Constitution will take roughly two years to come into effect. Second, relying on the SJC's language in Albano v. Attorney General, 769 N.E.2d 1242, 1246 (2002), the plaintiffs contend that the SJC would not permit a constitutional amendment to render ineffective actions taken before the date of the amendment. Thus, conclude the plaintiffs, even an amendment would not void Goodridge, so there is no way to undo the effect of Goodridge between its implementation and the passage of a subsequent initiative amendment. As a result, plaintiffs argue that "in the interim, [they] suffer loss of their representative

-18-

form of government in the same way they would suffer loss if the SJC had abolished the legislature."

This argument goes too far. The SJC has not abolished the legislature. The amendment process enshrined in the Massachusetts Constitution is purposely designed to be slow; that choice is itself a result of the state's republican form of government. Moreover, even were the plaintiffs' reading of Albano correct, an issue we do not decide, then the inability of a constitutional amendment to void Goodridge retroactively is also the result of a republican form of government in action. It was the Massachusetts people who amended the state constitution in 1918 to provide for certain limitations in the process of constitutional amendment. See Mass. Const. amend. art. XLVIII, pt. II, § 2.

The resolution of the same-sex marriage issue by the judicial branch of the Massachusetts government, subject to override by the voters through the state constitutional amendment process, does not plausibly constitute a threat to a republican form of government. Absent such a threat, our federal constitutional system simply does not permit a federal court to intervene in the arrangement of state government under the guise of a federal Guarantee Clause question. Such an intervention would itself threaten federal court interference with the very form of government that the people of Massachusetts have chosen for themselves. Perhaps, in unusual and extreme cases, such as the

-19-

establishment of a monarchy by a state in place of a republican form of government, individuals could utilize the federal courts to enforce the Guarantee Clause.  See The Federalist No. 43, at 311 (J. Madison) (B. Wright ed., 1961) (the Guarantee Clause gives "the superintending government . . . authority to defend the system against aristocratic or monarchical innovations").  That is not this case.

### III.

We **affirm** the denial of injunctive and declaratory relief.  No costs are awarded.