SEYMOUR, Circuit Judge.
 

 This case has a long history. The issue currently before us is whether certain school districts, a special district board, and/or a county commission have standing to challenge Colorado's Taxpayer Bill of Rights ("TABOR"). Colo. Const. art. X, § 20. TABOR allows the people of Colorado to raise or prevent tax increases by popular vote, thereby limiting the power of Colorado's legislative bodies to levy taxes. On a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), the district court held that plaintiffs had Article III standing but that they lacked political subdivision standing and prudential standing. Accordingly, the court dismissed the complaint. Plaintiffs appeal.
 

 This case is rife with difficult issues, and we applaud the district court for its attempts to "don waders" and generate some cognizable structure out of the sludge. Nevertheless, we conclude that it could not properly reach its conclusions at this stage of litigation. Because we hold that the political subdivision plaintiffs are not barred by standing requirements, we reverse.
 

 I.
 

 Plaintiffs contend that TABOR denies them a "republican form of government" as guaranteed by Congress in the Colorado Enabling Act, ch. 139,
 
 18 Stat. 474
 
 (1875) ("Enabling Act"), because it takes power from the legislature and puts it into the hands of the people of Colorado in violation of the Guarantee Clause,
 
 see
 
 U.S. Const. art. IV, § 4, and the Enabling Act as enforced by the Supremacy Clause,
 
 see
 
 U.S. Const. art. VI, § 2. In one of our prior opinions, we held that certain individual legislator plaintiffs had standing to make this claim and that the claim was not a nonjusticiable political question.
 
 See
 

 Kerr v. Hickenlooper
 
 ,
 
 744 F.3d 1156
 
 , 1161 (10th Cir. 2014) ("
 
 Kerr I
 
 "). On appeal, the Supreme Court vacated and remanded the matter to us for further consideration in light of its opinion in
 
 Arizona State Legislature v. Arizona Indep. Redistricting Com'n
 
 , --- U.S. ----,
 
 135 S. Ct. 2652
 
 ,
 
 192 L.Ed.2d 704
 
 (2015).
 
 See
 

 Hickenlooper v. Kerr
 
 , --- U.S. ----,
 
 135 S. Ct. 2927
 
 ,
 
 192 L.Ed.2d 956
 
 (2015).
 

 On remand, we held that the individual legislator plaintiffs lacked standing because they were asserting an institutional injury.
 
 Kerr v. Hickenlooper
 
 ,
 
 824 F.3d 1207
 
 , 1211 (10th Cir. 2016) ("
 
 Kerr II
 
 "). We instructed the district court to determine whether any other plaintiffs had standing. Back at the district court, plaintiffs amended their complaint to add certain additional entities: eight school boards, the Board of County Commissioners of Boulder County, and a special district board. As noted, the district court thereafter dismissed the complaint.
 

 TABOR prevents the state legislature and local entities from enacting new taxes or raising taxes except by popular vote. Particularly significant to plaintiffs in this case, TABOR
 
 prohibits
 
 state and local governments from appropriating revenue in excess of the prior year's spending, and it
 
 requires
 
 the state and local governments to refund taxpayers for revenues appropriated in excess of the prior year's spending. Colo. Const. art. X, § 20 (7)(a) & (d). TABOR also causes plaintiffs to incur costs from presenting matters to voters. Plaintiffs allege that these requirements inhibit them from performing their mandated responsibilities under Colorado law.
 
 See, e.g.
 
 , Colo. Const. art. XIV.
 
 [1]
 

 As a condition of admitting Colorado to the Union, Congress required that the state's constitution "shall be republican in form."
 
 18 Stat. 474
 
 . This language mimics the language from the Guarantee Clause of the United States Constitution.
 
 See
 
 U.S. Const. art. IV, § 4. Under the Supremacy Clause, federal law controls when federal and state law are in conflict with one another. U.S. Const. art. VI, § 2. Plaintiffs contend that TABOR denies them the republican form of government required of the state of Colorado by the Enabling Act and is thus unconstitutional under the Supremacy Clause.
 

 II.
 

 We review the district court's "dismissal for lack of standing de novo, applying the same standard used by the district court."
 
 Petrella v. Brownback
 
 ,
 
 697 F.3d 1285
 
 , 1292 (10th Cir. 2012) (internal quotation marks omitted). "[A]s in all standing inquiries, the critical question is whether at least one petitioner has alleged such a personal stake in the outcome of the controversy as to warrant
 
 his
 
 invocation of federal-court jurisdiction."
 
 Horne v. Flores
 
 ,
 
 557 U.S. 433
 
 , 445,
 
 129 S.Ct. 2579
 
 ,
 
 174 L.Ed.2d 406
 
 (2009) (emphasis in original);
 
 see also
 

 Watt v. Energy Action Educ. Found.
 
 ,
 
 454 U.S. 151
 
 , 160,
 
 102 S.Ct. 205
 
 ,
 
 70 L.Ed.2d 309
 
 (1981) ;
 
 Village of Arlington Heights v. Metro. Hous. Dev. Corp.
 
 ,
 
 429 U.S. 252
 
 , 264 n.9,
 
 97 S.Ct. 555
 
 ,
 
 50 L.Ed.2d 450
 
 (1977). Thus, if at least one plaintiff can demonstrate standing, we need not consider standing for the other plaintiffs. The district court determined that the political subdivision plaintiffs established Article III standing and defendants do not contest this conclusion on appeal. Even so, the district court dismissed the action for lack of subject matter jurisdiction because it concluded that two independent doctrines barred these plaintiffs: political subdivision standing and prudential standing. The issue before us is whether these other limitations indeed preclude the political subdivision plaintiffs from establishing standing.
 

 III.
 

 We begin by determining whether there are "prudential standing" limitations preventing plaintiffs from challenging TABOR. Plaintiffs argue that in light of the Supreme Court's decision in
 
 Lexmark Int'l, Inc. v. Static Control Components, Inc.
 
 ,
 
 572 U.S. 118
 
 ,
 
 134 S.Ct. 1377
 
 ,
 
 188 L.Ed.2d 392
 
 (2014), the district court erred in examining these prudential concerns on a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction.
 
 [2]
 
 We agree. In
 
 Lexmark
 
 , the Supreme Court described the label "prudential standing" as "misleading" and "inapt."
 
 [3]
 

 See
 

 id.
 
 at 125, 127 n.3,
 
 134 S.Ct. 1377
 
 . "Although the jurisprudence surrounding standing and jurisdiction has at times been muddled, we have clearly held that prudential standing is not a jurisdictional limitation ...."
 
 Niemi v. Lasshofer
 
 ,
 
 770 F.3d 1331
 
 , 1345 (10th Cir. 2014) (citing
 
 Wilderness Soc. v. Kane Cnty
 
 .,
 
 632 F.3d 1162
 
 , 1168 n.1 (10th Cir. 2011) (en banc)). Accordingly, the district court should not have evaluated defendant's motion to dismiss for lack of subject matter jurisdiction on the basis of prudential standing.
 
 See
 

 VR Acquisitions, LLC v. Wasatch Cnty
 
 .,
 
 853 F.3d 1142
 
 , 1146 n.4 (10th Cir. 2017).
 

 IV.
 

 Properly situating the prudential standing inquiry does not complete our analysis. The district court also found that, independently of prudential standing concerns, the political subdivision plaintiffs are barred by political subdivision standing restrictions.
 
 [4]
 

 It is true that political subdivisions generally lack standing to sue their
 creating state.
 
 Housing Authority of Kaw Tribe of Indians of Oklahoma v. City of Ponca City
 
 ,
 
 952 F.2d 1183
 
 , 1188 (10th Cir. 1991). But "the Supreme Court and courts of appeals have shied away from erecting an absolute bar."
 
 City of Hugo v. Nichols
 
 ,
 
 656 F.3d 1251
 
 , 1256 (10th Cir. 2011). In certain circumstances we have held that political subdivisions have standing, and two cases guide our analysis:
 
 City of Hugo,
 
 and
 
 Branson v. Romer
 
 ,
 
 161 F.3d 619
 
 (10th Cir. 1998). The district court and plaintiffs differ in their interpretations of the scope of these holdings.
 
 [5]
 
 Because we conclude that under either proffered formulation the district court erred in dismissing these claims on a Rule 12(b)(1) motion, we need not determine the precise reach of these precedents.
 

 Plaintiffs assert the essence of
 
 City of Hugo
 
 and
 
 Branson
 
 is that "a political subdivision has standing to bring a constitutional claim against its creating state when the substance of its claim relies on the Supremacy Clause and a putatively controlling federal law."
 
 Branson
 
 ,
 
 161 F.3d at 628
 
 . They identify the dispositive question as whether the right sought to be vindicated was "written to protect individual rights, as opposed to collective or structural rights."
 

 Id.
 

 Arguing that the political subdivision plaintiffs here, like those in
 
 Branson
 
 , seek to vindicate federal rights that are statutory, structural and collective rather than constitutional, individual and contractual, they urge the conclusion that as in
 
 Branson
 
 the political subdivision plaintiffs here have standing. The government does not contest that employing this interpretation of our precedents casts the present political subdivision plaintiffs under the precedential force of
 
 Branson
 
 rather than
 
 City of Hugo
 
 . Therefore, if this interpretation of our case law is to be applied, these plaintiffs are not barred by political subdivision standing considerations.
 

 Alternatively, the district court, the government, and the dissent all read
 
 City of Hugo
 
 as requiring that "the federal statute being enforced must be 'directed at protecting political subdivisions.' "
 
 [6]
 

 Kerr v. Hickenlooper
 
 ,
 
 259 F. Supp. 3d 1178
 
 , 1188 (D. Colo. 2017) ("
 
 Kerr
 
 ") (citing
 
 City of Hugo
 
 ,
 
 656 F.3d at
 
 1257 ). Scrutinizing plaintiffs' assertion that "the political-subdivision plaintiffs are seeking to enforce rights granted to them in the Enabling Act,"
 
 id.
 
 at 1188, the district court countered that the Enabling Act's requirement that the Colorado constitution be "republican in form" was not designed for such plaintiffs. Instead, the district court concluded that nearby language in the Enabling Act revealed the requirement of "republican in form" as being granted to "the
 
 people
 
 of Colorado."
 
 Id.
 
 at 1191 (emphasis added). It surmised that the political subdivision plaintiffs had been granted no statutory rights to vindicate this interest, and that they were accordingly barred by political subdivision standing.
 

 But we cannot decisively determine if the political subdivision plaintiffs here are excepted from the usual bar to political subdivision standing because doing so would require impermissibly delving into the merits of the case. Establishing
 
 who
 
 was intended to benefit from the Enabling Act's "republican in form" requirement necessarily begs the question of
 
 what
 
 a "Republican Form of Government" is, which is the issue ultimately to be resolved if any court ever succeeds in reaching the merits of this case.
 
 See
 

 Largess v. Supreme Judicial Court for State of Massachusetts
 
 ,
 
 373 F.3d 219
 
 , 226 (1st Cir. 2004) (proceeding to merits to review scope and meaning of "Republican Form of Government"). Even the district court modulated its conclusion that "republican in form" does not extend rights to the political subdivision plaintiffs by stating that it so finds "based on the present record."
 
 Kerr
 
 ,
 
 259 F. Supp. 3d at 1190-91
 
 . But the present record is insufficient to support this determination.
 

 Throughout their various pleadings, plaintiffs maintain that a "Republican Form of Government" extends protections directly to these political subdivision plaintiffs that TABOR unconstitutionally intrudes upon. They offer several hooks hinting at their arguments on the merits of the case, including the observations that the Enabling Act recognized the existence of
 both counties and public schools
 
 prior
 
 to Colorado's statehood, and that the constitution Colorado adopted pursuant to the Enabling Act embodied an interdependent structure between the state and its existing political subdivisions.
 
 See
 
 Aplt. Reply Br. at 21 n.13.
 
 [7]
 
 Notably, plaintiffs allege that a "fully effective legislature is an essential component of a Republican Form of Government," and that the TABOR Amendment's substantial interference with the Colorado General Assembly's taxing power "renders [it] unable to fulfill its legislative obligations .... [and] similarly undermines the Republican Form of Government for all subordinate levels of government in the state." Aplt. App. at 1447 (Complaint at ¶108). They further argue that a "Republican Form of Government"
 
 necessarily
 
 extends to each lower level of government because acceptance of the contrary would beget complete evasion of this requirement through the delegation of powers to subordinate levels of government that were not equally "republican in form."
 
 Id.
 
 at 1424 (Complaint at ¶11). Plaintiffs have informed us that their case on the merits "will offer extensive historical evidence of and legal proof for the proper meaning of the Guarantee Clause and 'Republican Form of Government.' " Aplt. Reply Br. at 25 n.15.
 

 In response, both the government and the district court valiantly struggle to
 
 conclusively
 
 establish that the political subdivision plaintiffs are
 
 not
 
 the beneficiaries of a "Republican Form of Government." They extend various conjectural standards in doing so, including that the constitutional guarantee of a republican form of government is a guarantee to the
 
 state
 
 that does not extend to individuals, Aple. Br. at 20,
 
 [8]
 
 and that this guarantee is to the
 
 people
 
 of the state,
 
 Kerr
 
 ,
 
 259 F.Supp. 3d at 1191
 
 . Citing a variety of reasons, the district court declared it "does not believe" that the requirement of a Constitution "republican in form" stretches to the political-subdivision plaintiffs. But each proposed rationale is insufficient to extricate the standing inquiry from the case on the merits, which is not presently before us on this appeal from the grant of a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1).
 
 See
 

 Initiative & Referendum Inst. v. Walker
 
 ,
 
 450 F.3d 1082
 
 , 1088 (10th Cir. 2006) (en banc) ("For purposes of the standing inquiry, the question is not whether the alleged injury rises to the level of a constitutional violation. That is the issue on the merits. For standing purposes, we ask only if there was an injury in fact, caused by the challenged action and redressable in court."),
 
 cert. denied
 
 ,
 
 549 U.S. 1245
 
 ,
 
 127 S.Ct. 1254
 
 ,
 
 167 L.Ed.2d 145
 
 (2007) ;
 
 Day v. Bond
 
 ,
 
 500 F.3d 1127
 
 , 1137 (10th Cir. 2007) (" 'For purposes of standing,' we noted [in
 
 Walker
 
 ], 'the question cannot be whether the Constitution, properly interpreted, extends protection to the plaintiff's asserted right or interest,' because that would be a determination of the merits of the plaintiffs' claim under the guise of an evaluation of their standing.").
 

 The district court forged on, concluding that "the political subdivision plaintiffs cannot be seeking to enforce a right to a Constitution 'republican in form' because they have no such right" and it "is not their injury to assert."
 
 Kerr
 
 ,
 
 259 F. Supp. 3d at 1191, 1192
 
 . This conclusion is problematic for two reasons: first, to some extent it contradicts the court's earlier finding that the political subdivision plaintiffs have personally suffered a concrete injury directly at the hand of TABOR; second, and more importantly, this is now dabbling in the merits of this case. Granted, we have previously explained that "the term 'legally protected interest' must do some work in the standing analysis ... [and] has independent force and meaning, without any need to open the door to merits considerations at the jurisdictional stage."
 
 Walker
 
 ,
 
 450 F.3d at 1093
 
 . We have not explained what that independent force and meaning are but, in any event, the present case falls nowhere near the illustrative list of situations we provided in which an asserted "legally protected interest" is not recognized.
 
 [9]
 

 The district court cited
 
 Day
 
 to try to unwind the merits from the jurisdictional issue, stating that the standing issue of whether political subdivision plaintiffs "are enforcing rights granted to them by the Enabling Act" is "a completely different inquiry to whether a Republican form of government has been undermined by TABOR."
 
 Kerr
 
 ,
 
 259 F. Supp. 3d at 1192
 
 . But the distinction between these two inquiries dissolves when traced back to the root question: both inquires require
 
 first
 
 determining the meaning and purpose of the phrase "republican in form." The standing question and merit question here are not two separate and independent issues, analogous to
 
 Day
 
 , but are instead comparable to
 
 Walker
 

 :
 
 the merits of the plaintiffs' claims mirror the standing inquiry as it is
 framed by the district court.
 
 See
 

 Day
 
 ,
 
 500 F.3d at 1138
 
 . "[T]he circumstances of this case present a rare instance in which the standing issue is intertwined and inseparable from the merits of the underlying claim."
 
 Largess
 
 ,
 
 373 F.3d at
 
 224 ;
 
 see also
 

 Paper, Allied-Indus., Chem. And Energy Workers Int'l Union v. Cont'l Carbon Co.
 
 ,
 
 428 F.3d 1285
 
 , 1292 (10th Cir. 2005) ("The underlying issue in determining whether the jurisdictional question is intertwined with the merits is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim.") (internal brackets and citation omitted);
 
 Sizova v. Nat. Inst. of Standards & Tech.
 
 ,
 
 282 F.3d 1320
 
 , 1324 (10th Cir. 2002) ("[S]ubject matter jurisdiction and the merits are considered to be intertwined when subject matter jurisdiction is dependent upon the same statute which provides the substantive claim in the case.") (internal brackets, quotation mark, and citation omitted);
 
 [10]
 

 cf.
 
 Kennan,
 
 supra
 
 note 4 (arguing that questions of whether political subdivisions should be barred from bringing suit because it would impede state sovereignty can only be determined by addressing the merits of the subdivision's claims that state action violates the Supremacy Clause).
 

 The various conclusions the district court and parties draw regarding "republican in form" are not of most interest to our analysis. Rather, it is the attempt itself which betrays the fundamental hitch-that these standing arguments turn on the merits of plaintiffs' claims, namely the meaning, scope, and intended beneficiaries of the Enabling Act's requirement that Colorado's constitution be "republican in form."
 
 See
 
 Aplt. Reply Br. at 24. We are not commenting on the validity or weight of any of these arguments but merely highlighting the degree of uncertainty present at this stage.
 
 See
 

 Schramm v. Oakes
 
 ,
 
 352 F.2d 143
 
 , 149 (10th Cir. 1965) (holding standing inquiry to be intertwined with the merits because "[b]ased then on what we have, we are unable to say with any degree of legal certainty that the appellants could not make out a valid cause of action"). The merits of these issues were not presented to the district court and are not before us. We thus cannot say with confidence what is entailed by the Enabling Act's requirement for a government "republican in form," and neither can we say with confidence what is not.
 

 This uncertainty is particularly apparent when we examine the paucity of jurisprudence concerning the scope and meaning of guarantees to a "Republican Form of Government." As tellingly described by the First Circuit,
 

 scholars have interpreted this [republican form of government] portion of the Guarantee Clause in numerous, often conflicting, ways. And John Adams himself, twenty years after ratification of the Constitution, confessed that he "never
 understood" what the Guarantee Clause meant and that he "believ[ed] no man ever did or ever will."
 

 Largess
 
 ,
 
 373 F.3d at 226-27
 
 (citations omitted);
 
 see also
 
 Aplt. Reply Br. at 16 n.7 (citing
 
 Minor v. Happersett,
 
 88 U.S. (21 Wall.) 162, 175-77,
 
 22 L.Ed. 627
 
 (1874) ). There can be no doubt that disentangling these answers will be an immense task; however, this is not a task to be undertaken on a Rule 12(b)(1) motion such as this.
 

 We sympathize with the reality that "standing doctrine sometimes has a frustratingly metaphysical quality."
 
 Walker
 
 ,
 
 450 F.3d at 1097
 
 . But "a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging."
 
 Lexmark Int'l, Inc.
 
 ,
 
 572 U.S. at 126
 
 ,
 
 134 S.Ct. 1377
 
 ;
 
 see also
 

 Odom v. Penske Truck Leasing Co., L.P.
 
 ,
 
 893 F.3d 739
 
 , 743 (10th Cir. 2018) (citing
 
 Lexmark
 
 to construe prudential restraints narrowly). Irrespective of whether or not a republican form of government is eventually found to be guaranteed to these particular plaintiffs, the district court cannot properly reach this issue as a jurisdictional matter. Because these political subdivision plaintiffs have Article III standing and cannot be
 
 irrefutably
 
 barred by alternative standing doctrines, the district court should not have dismissed the complaint for a lack of subject matter jurisdiction.
 

 We REVERSE and REMAND to the district court for further proceedings.
 

 In Colorado, the burden of adopting budgets and funding government programs falls on the representatives of the state, including plaintiffs in this case.
 
 See
 
 Colorado Territorial Act of 1861, ch. 59,
 
 12 Stat. 176
 
 §§ 4, 6, 7; Enabling Act §§ 3, 4 ;
 
 Colo. Rev. Stat. § 30-11-103
 
 (2017) (county governments);
 
 Colo. Rev. Stat. § 30-11-101
 
 (2017) (special districts).
 

 Defendant argues that we should review plaintiffs' prudential standing arguments only for plain error because they failed to argue prudential standing in district court.
 
 Richison v. Ernest Grp., Inc.
 
 ,
 
 634 F.3d 1123
 
 , 1128 (10th Cir. 2011) ("[I]f the theory simply wasn't raised before the district court, we usually hold it forfeited."). We disagree. Plaintiffs raised prudential standing arguments in their brief in opposition to defendants' motion to dismiss before the district court.
 
 See
 
 Aplt. App. at 1489-90. In doing so, they specifically addressed
 
 Lexmark
 
 and the three principles implicated in prudential standing, "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."
 
 Lexmark
 
 ,
 
 572 U.S. at 125
 
 ,
 
 134 S.Ct. 1377
 
 .
 

 Lexmark
 
 made clear that the first two principles previously labelled as prudential standing are not independent jurisdictional hurdles.
 
 See
 

 id
 
 . at 128 n.4,
 
 134 S.Ct. 1377
 
 (clarifying that the zone-of-interests test "does not implicate subject matter jurisdiction" but is a question of whether plaintiff has a valid cause of action), 127 n.3 (generalized grievances are "barred for constitutional reasons, not 'prudential' ones"). If the last principle-the limitation on third-party standing-retains any potency at this stage of litigation, that inquiry is inextricably intertwined with the merits of the present case.
 
 See infra.
 

 As an initial matter, plaintiffs note in their opening brief that "[it] is not entirely clear whether 'political subdivision standing' should be treated doctrinally as another subcategory of prudential standing." Aplt. Br. At 9-10. In the most recent precedential case on point, we acknowledged there is "serious reason to doubt" whether political subdivision standing is a jurisdictional limitation.
 
 City of Hugo v. Nichols
 
 ,
 
 656 F.3d 1251
 
 , 1255 (10th Cir. 2011) ;
 
 cf.
 
 Brian P. Kennan,
 
 Subdivisions, Standing and the Supremacy Clause: Can a Political Subdivision Sue its Parent State Under Federal Law?
 
 ,
 
 103 Mich. L. Rev. 1899
 
 (2005) (noting Supreme Court's precedential "political subdivision standing" cases were actually decided on the merits and not as jurisdictional issues).
 
 City of Hugo
 
 concluded that it was nevertheless bound by this court's prior decision casting the doctrine as one of jurisdictional standing.
 
 Id
 
 . at n.4 (referring to
 
 Branson v. Romer
 
 ,
 
 161 F.3d 619
 
 (10th Cir. 1998) ).
 

 The dissent agrees with the district court's understanding of
 
 City of Hugo
 
 : the federal statute being enforced must be "directed at protecting political subdivisions." Dissent at 1201 (citation omitted). Declaring plaintiffs make "virtually no argument that
 
 if
 
 a 'directed at protecting' requirement applies, it is satisfied," the dissent concludes they have waived this dispositive issue.
 
 Id.
 
 at 1202-03 (emphasis in original). But the dissent itself accentuates the key word here: the dispute is "if" such a requirement applies. Plaintiffs' explanation for why the district court is wrong regarding the application of our political subdivision standing precedents is that the district court erred in discerning the applicable legal standard.
 
 See, e.g
 
 ., Aplt. Br. at 26 n.13 ("The District Court erred in concluding that more is needed for a political subdivision to sue. It stretched the
 
 Branson II
 
 Court's
 
 dicta
 
 to impose two additional requirements for political subdivision standing .... Beyond granting inappropriate weight to dicta, such requirements represent a broad expansion of precedent that confuses the standing analysis.") (emphasis in original). Nonetheless, plaintiffs' analysis with respect to their satisfaction of the statutory "zone of interests" test also speaks to this "directed at protecting" requirement as it is presented by the district court. They have responded to the district court's political subdivision standing analysis sufficiently to avoid waiver.
 

 Plaintiffs and the Amici Curiae both raise credible concerns about this rule being drawn from our political subdivision standing precedents.
 
 City of Hugo
 
 's analysis focused on whether substantive
 
 constitutional
 
 rights can be the basis for political subdivision standing and did not itself engage in any
 
 statutory
 
 analysis. Our precedents thus provide no workable standards regarding what language a statute must include for it to be "directed at protecting political subdivisions" or how such a rule should be applied.
 
 See
 
 Amicus Br. of Colo. Ass'n of Sch. Bds. & Colo. Ass'n of Sch. Execs. at 12. Moreover, courts are already required to examine whether a plaintiff's claims fall within the "zone of interests" of a federal statute when determining whether that plaintiff has a cause of action,
 
 see
 

 Lexmark
 
 ,
 
 572 U.S. at 128
 
 ,
 
 134 S.Ct. 1377
 
 , and "[s]hoehorning a more stringent requirement for direct statutory protection into the political subdivision analysis would render the Supreme Court's well established zone of interests test superfluous." Aplt. Br. at 26 n.13.
 

 This reading of
 
 City of Hugo
 
 's holding is also contrary to two limiting trends of the Supreme Court and lower courts: to limit the doctrine of political subdivision standing,
 
 see
 

 City of Hugo
 
 ,
 
 656 F.3d at 1265
 
 (Matheson, J., dissenting), and the more recent emphasis on federal courts' "virtually unflagging" obligation to hear and decide cases within their jurisdiction,
 
 see
 

 Lexmark
 
 ,
 
 572 U.S. at
 
 127 n.3, 128 n.4,
 
 134 S.Ct. 1377
 
 (limiting the application of prudential standing doctrines as subject matter jurisdiction inquiries);
 
 see also
 

 Susan B. Anthony List v. Driehaus
 
 ,
 
 573 U.S. 149
 
 ,
 
 134 S. Ct. 2334
 
 , 2347,
 
 189 L.Ed.2d 246
 
 (2014) (discussing, but not resolving, prudential ripeness doctrine's tension with the federal courts' "virtually unflagging" obligation);
 
 Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City
 
 ,
 
 861 F.3d 1052
 
 , 1059 n.1 (10th Cir. 2017) (Matheson, J., concurring) (citing Supreme Court's choice not to resolve this tension, but continuing to apply ripeness doctrine as binding precedent), 1076 n.13 (Bacharach, J., concurring) (same);
 
 Fowler v. Guerin
 
 ,
 
 899 F.3d 1112
 
 , 1116 n.1 (9th Cir. 2018) (citing Supreme Court's choice not to resolve this tension and likewise declining to resolve the continuing vitality of ripeness doctrine).
 

 In declining to determine the proper test for political subdivision standing, we do not resolve these concerns. Even so, we call attention to them as supplementary support for our holding that these plaintiffs should not have been dismissed on these grounds.
 

 See also, e.g
 
 ., Aplt. Br. at 7-8 ("[T]he requirement for a 'republican form of government' applies not only on the state government but also to the state's local governments. The Enabling Act, together with the Colorado Constitution enacted in compliance with the requirements of the Enabling Act, created an integrated structure of government. ..."),
 

 id.
 

 at 27 n.15 ("Colorado's Constitution established a republican form of government that was grounded in a structure that embodied a purposeful interdependence between the state and its political subdivisions. The Constitution expressly considered school boards and county governments. ... The historic existence of the Political Subdivision Plaintiffs is of a piece with Colorado's republican form of government and its origins."),
 
 id
 
 . at 36 ("From its outset, and presumably inherent in its acceptance into the Union, the Colorado Constitution's guarantee of a republican government entailed an interdependent relationship between state government and local political subdivisions with the inherent authority to raise and spend revenue.").
 

 Tellingly, one of the cases the government cites for this proposition is
 
 Largess
 
 , in which the First Circuit explicitly decided it could
 
 not
 
 deny individuals standing under the Guarantee Clause because the standing issue was "intertwined and inseparable from the merits of the underlying claim."
 
 Largess
 
 ,
 
 373 F.3d at 224
 
 . The underlying claim was that the Guarantee Clause extends rights to individuals in at least some circumstances and the First Circuit footnoted the clarification that "the Guarantee Clause makes the guarantee of a republican form of government to
 
 the states
 
 ; the bare language of the Clause does not directly confer any rights on individuals."
 
 Id
 
 . at 225 n.5. Notwithstanding this skepticism as to whether individuals would ever have enforceable rights under the Guarantee Clause, the First Circuit held that plaintiffs had standing. It
 
 then
 
 proceeded to analyze the Guarantee Clause and ultimately hold that the
 
 Largess
 
 plaintiffs did not have enforceable rights under the Guarantee Clause, leaving open the question whether any individuals could ever have enforceable rights under the Guarantee Clause.
 
 See generally
 

 id
 
 . at 226-229. Critically for our analysis, the First Circuit's review of the scope of the "Republican Form of Government" guarantee did not take place until
 
 after
 
 the recognition that this particular question was interwoven into the initial standing inquiry. Here, in contrast, the merits of the case are not before us.
 

 The dissent's efforts to distinguish this case as irrelevant are unconvincing. Although the standing inquiries in
 
 Largess
 
 and our case differ, the nature of these inquiries are equally intertwined with the merits in both cases.
 

 "For example, a person complaining that government action will make his criminal activity more difficult lacks standing because his interest is not legally protected. A person suing to require enforcement of the law against his neighbor lacks standing, even if he is adversely affected by his neighbor's conduct, because no one has a legally protected interest in the prosecution of another. Finally, a plaintiff whose claimed legal right is so preposterous as to be legally frivolous may lack standing on the ground that the right is not legally protected."
 
 Walker
 
 ,
 
 450 F.3d at 1093
 
 (internal quotation marks and citations omitted).
 

 The dissent believes that political subdivision standing requires a searching analysis of the relevant federal statute's intended beneficiaries "as part of a
 
 threshold jurisdictional standing
 
 inquiry .... [i]rrespective of whether this may sometimes resemble a merits analysis." Dissent at 1205 (emphasis in original). However, this ignores our cases recognizing that it is sometimes appropriate to decide a jurisdictional issue at a later stage in the proceeding if that issue is intertwined with the merits of the case. In the same manner, it is noteworthy that even where our precedents cast the political subdivision standing doctrine as jurisdictional, they address it at later stages in litigation and with access to considerably more information than entailed by the Rule 12(b)(1) motion here.
 
 See
 

 City of Hugo
 
 ,
 
 656 F.3d at 1254
 
 (district court granted summary judgment);
 
 Branson
 
 ,
 
 161 F.3d at 627
 
 (district court held hearing on plaintiffs' request for preliminary injunction, then issued "very careful and thorough opinion" following cross-motions for summary judgment).